GIBSON, DUNN & CRUTCHER LLP
JOSH KREVITT, SBN 208552
   jkrevitt@gibsondunn.com
310 University Avenue
Palo Alto, California 94301-1744
Telephone: 650.849.5300
Facsimile: 650.849.5333

ORIN SNYDER (*pro hac vice forthcoming*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
2000 Avenue of the Stars, Suite 1200N
Los Angeles, California 90067-4700
Telephone: 310.552.8500
Facsimile: 310.551.8741

*Attorneys for Plaintiff*
TESLA, INC.

TESLA, INC.
TERRY W. AHEARN, SBN 216543
   tahearn@tesla.com
A. LOUIS DORNY, SBN 212054
   ldorny@tesla.com
KRISTA M. CARTER, SBN 225229
   kricarter@tesla.com
3000 Hanover Street
Palo Alto, California 94304
Telephone: 408.204.7384

*Attorneys for Plaintiff*
TESLA, INC.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESLA, INC., a Texas Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>PROCEPTION, INC, a Delaware Corporation, and ZHONGJIE "JAY" LI, an individual,<br><br>        Defendants. | Case No. 5:25-cv-04963<br><br>**COMPLAINT FOR:**<br><br>1. **Federal Misappropriation of Trade Secrets (18 U.S.C. §§ 1836, et seq.)**<br><br>2. **State Misappropriation of Trade Secrets (Cal. Civ. Code §§ 3426, et seq.)**<br><br>3. **Tortious Interference with Contract**<br><br>4. **Quasi-Contract/Restitution** |

Plaintiff Tesla, Inc. ("Tesla" or "Plaintiff"), by way of its Original Complaint against Defendant Proception, Inc. ("Proception") and Defendant Zhongjie "Jay" Li ("Li") (collectively "Defendants") states and alleges as follows:

**INTRODUCTION**

1. Tesla is a global leader in robotics, artificial intelligence, and innovation—developing technologies that push the boundaries of what machines can do and how they can improve human life. At the center of that mission is Optimus, Tesla's autonomous humanoid robot—one of the most sophisticated platforms of its kind, built through years of research, engineering excellence, proprietary design, and visionary ambition. Tesla's Optimus is a general-purpose, bi-pedal robot capable of performing everyday tasks, developed to reduce the need for human labor and advance a future where intelligent machines assist people in meaningful ways.

2. This action arises from the unlawful acquisition, use, and/or exploitation of Tesla's Optimus-related trade secrets by Defendant Zhongjie "Jay" Li and the start-up he co-founded, Proception, Inc. While employed at Tesla, Li worked on key components of Tesla's Optimus—including advanced robotic hand sensors—and was entrusted with some of the most sensitive technical data in the program. In the final weeks before his departure, and knowing he planned to launch a competing robotics company, Li downloaded Optimus-related files onto two personal smartphones. Less than a week after he left Tesla, Proception was incorporated. And within just five months, Proception publicly claimed to have "successfully built" advanced humanoid robotic hands—hands that bear a striking resemblance to the designs Li worked on at Tesla.

3. Rather than build through legitimate innovation, trial, and technical rigor, Defendants took a shortcut: theft. They misappropriated Tesla's most sensitive materials, sidestepped the laborious process of development, and launched a company based not on original discovery, but on stolen work. Their conduct is not only unlawful trade misappropriation—it also constitutes a calculated effort to exploit Tesla's investments, insights, and intellectual property for their own commercial gain.

4. At the heart of this misappropriation is one of the most technically complex and strategically vital aspects of Tesla's Optimus program: the humanoid robotic hand. Tesla's work

on this component reflects many thousands of engineering hours, multiple technical design generations, and millions of dollars in R&D investment. The trade secrets at issue include highly sensitive (1) engineering specifications, schematics, and blueprints, including measurements, grips, tensions, ranges of motion, and degrees of freedom; (2) tests, their results, and technical analyses; (3) models; (4) product roadmaps; (5) close-range video profiles of prototypes; (6) strategy documents; (7) vendor research; and (8) source code related to Optimus's hand motion and actuators—all of which are highly valuable and confidential information regarding the Optimus project that collectively represent the crown jewels of Tesla's robotics efforts.

5. Tesla brings this action not only to protect what it has built but to uphold the basic rules of technological competition. Innovation must be earned, not stolen. If misconduct like this goes unchecked, it risks incentivizing theft over creation and undermining the very ecosystem that drives progress. Tesla is committed to ensuring that the future it envisions—where technology serves humanity and breakthroughs are achieved through integrity and ingenuity—remains protected and secure. This lawsuit seeks to hold Defendants accountable for their wrongful acts and prevent further harm to Tesla.

**PARTIES**

6. Plaintiff Tesla is a Texas corporation, having its principal place of business at 1 Tesla Road, Austin, Texas 78725.

7. On information and belief, Defendant Proception, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 350 Cambridge Avenue, Suite 225, Palo Alto, California 94306.

8. On information and belief, Defendant Li is an individual who resides in this District and is a Co-Founder and CEO of Defendant Proception.

**JURISDICTION AND VENUE**

9. This is a civil action for federal trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq., and the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, et seq.

10. This Court has federal question subject-matter jurisdiction over this action under the provisions of 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

11. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims because the state law claims are related to the federal trade secret misappropriation claims in this action, over which this Court has original jurisdiction, in that they form part of the same case or controversy under Article III of the United States Constitution.

12. This Court has personal jurisdiction over Defendant Proception because Proception has substantial connections to the State of California, including its principal place of business being located in this District and Division. Proception's connection to this State, District, and Division directly relates to the claims asserted, including Proception's deliberate targeting of Tesla's confidential and proprietary information and trade secrets also located in this District. The exercise of personal jurisdiction over Defendant Proception is reasonable and comports with long-established notions of fair play and substantial justice.

13. This Court has personal jurisdiction over Defendant Li because Li has substantial connections to the State of California, including by co-founding and being employed by Proception, which is located in this District and Division. Li's connection to this State, District, and Division directly relates to the claims asserted, including Li's misappropriation of Tesla's confidential and proprietary information and trade secrets, which also are located in this District. Li further agreed to submit to the jurisdiction of the state and federal courts located in the county and state in which he was primarily assigned to work by Tesla—Santa Clara County, California.[1] The exercise of personal jurisdiction over Defendant Li is reasonable and comports with long-established notions of fair play and substantial justice.

---

[1] Li and Tesla agreed to arbitrate breach of contract and misappropriation of trade secrets claims, among others. However, the arbitration agreement expressly states that "[n]othing in this agreement is intended to prevent either Party from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any arbitration pursuant to this Agreement; thus, claims for temporary or emergency injunctive relief to preserve the status quo prior to and/or in aid of arbitration are permitted." Ex. H at PDF p. 3.

14. Venue in this district is proper under 28 U.S.C. §1391 because Defendants are subject to personal jurisdiction here, and Plaintiff Tesla has suffered injury in this district.

### INTRADISTRICT ASSIGNMENT

15. In accordance with Civil Local Rule 3-2(c) and General Order 44, this action is properly assigned on a District-wide basis because it relates to intellectual property rights.

### GENERAL ALLEGATIONS

**A.    Tesla—A World Leader in Transformative Innovation—Invests in Developing A Humanoid Robot**

16. Founded in 2003, Tesla is a global leader in the design, development, and manufacture of electric vehicles and sustainable energy production and storage. Tesla employs over 130,000 people globally and is one of the largest private employers in the State of California. Tesla's success is rooted in continuous innovation, significant investment in emerging technologies, and the strategic adoption of its existing technologies to new applications.

17. In recent years, Tesla has devoted extraordinary resources to advancing artificial intelligence and developing a general-purpose humanoid known as "Optimus." Tesla's investment in Optimus embodies the company's broader vision for the future. Tesla views Optimus not merely as a product, but as a platform for human betterment. Tesla's Optimus is intended to perform an array of everyday tasks—from caregiving to teaching, from lawn maintenance to grocery shopping—that can enhance quality of life by alleviating the need for humans to perform repetitive, physically demanding, or even hazardous work.

18. To power Tesla's Optimus, Tesla has built a comprehensive robotic learning system that leverages artificial intelligence ("AI") to execute complex physical tasks. These tasks include full-body locomotion, precise manipulation, and eventual deployment in real-world production environments. Achieving this goal requires building the necessary hardware and software stacks that enable balance, navigation, perception, and interaction with the physical world. Moreover, the specific delivery of robotic hand functionality is among the most challenging in robotics, as it requires the delicate balancing of sensitivity of touch, freedom of range of motion, weight of appendage, and strength of grasp, among other things. Tesla's head of robotics touched on this

delicate balancing when announcing Tesla's Optimus hand advancements in November 2024. He explained:

> Our new hand/forearm with double the number of degrees of freedom[2] now in action on the bot! There's 22 DoFs on the hand, and 3 on the wrist/forearm. … Still some work to finish by end of year, in particular around extended tactile sensing integration (much more surface coverage than the previous hand), very fine controls through tendons, and shaving some weight off the forearm. All actuation has been moved to the forearm, which has increased its weight. Interesting challenge around having enough squishiness/compliance and a protective layer on the fingers & palm, without affecting tactile sensing too much.[3]

This field is also highly competitive, as multiple startups, established players, and vehicle manufacturers compete for technological advances over each other.

19. Tesla's multi-pronged investment in its Optimus is extensive. Since the company first announced the project in 2021, it has hired scores of specialized engineers, AI researchers, robotics experts, and manufacturing specialists dedicated to this endeavor, reflecting a deep, fervent commitment to building and supporting a world-class AI & Robotics division.

20. Beyond human capital, Tesla has dedicated substantial financial resources to Optimus. Although Tesla does not disclose the precise year-over-year investments in Optimus, the research and development costs are in the billions of dollars. Such an ambitious project demands unparalleled expertise and substantial time and financial commitment to achieve even incremental progress.

**B.    Tesla Takes Rigorous Steps to Protect Its Intellectual Property, Including Its Trade Secrets and Confidential Information at Issue Here**

21. Tesla does not take lightly its mission to improve lives through technology or the importance of protecting this groundbreaking work. As of January 23, 2025, Tesla holds approximately 226 globally issued patents that span the entire artificial intelligence ecosystem, including, specifically, humanoid robots. Tesla's proprietary information not only features patents but also encompasses trade secrets and other confidential information. As an organization, Tesla,

---

[2] "Degrees of Freedom" or DoFs refers to the number of independent movements a robotic appendage can make.
[3] https://x.com/_milankovac_/status/1862167219649818816?s=46&t=KBxh1z3A8BGjIJKlZ6jt-g

place[s] a strong emphasis on our innovative approach and proprietary designs which bring intrinsic value and uniqueness to our product portfolio. As part of our business, we seek to protect the underlying intellectual property rights of these innovations and designs such as with respect to patents, trademarks, copyrights, trade secrets and other measures, including through employee and third-party nondisclosure agreements and other contractual arrangements.[4]

22. To safeguard its confidential, proprietary, and trade secret information, Tesla has a rigorous security system in place consisting of contractual, digital, and physical controls, along with associated practices, protocols, and training.

23. Tesla goes to extraordinary lengths to ensure that its employees understand the significant responsibility they have to protect its confidential and proprietary information. As a condition of employment, all Tesla employees sign a Tesla, Inc. Employee Non-Disclosure and Inventions Assignment Agreement ("NDA"), among several other onboarding agreements. Ex. A. Through the NDA, Tesla employees pledge, among other things, to not disclose Tesla's "Proprietary Information," defined to include "all information, in whatever form and format, to which [they] have access by virtue of and in the course of my employment," and encompassing "technical data, trade secrets, know-how, research and development, products, features, concepts, ideas, plans, designs, formulas, methods, processes, discoveries, improvements, source and object codes, data, programs, lists of or information related to, suppliers, and customers, financial information and other business information, Inventions, and works of authorship." Ex. A, § 1. The NDA requires employees to "hold in strictest confidence" and "not disclose, use, or publish" any of Tesla's Proprietary Information without express written authorization. *Id.* From the moment Tesla employees sign on for the job, they understand their obligations to do the right things and act with integrity even when no one is looking.

24. As a condition of employment, Tesla employees also agree to be bound by Tesla's Code of Business Ethics, which requires employees to protect Tesla's confidential and/or proprietary information and Tesla's trade secrets. Ex. B at p. 6. Further, Tesla's Social Media Guidelines specifically prohibits disclosure of "Tesla's trade secrets, products or Tesla Business

---

[4] 2021, 2022, and 2023 Annual Reports at subsections titled: "Intellectual Property."

Data or of any manufacturing process." Ex. C at p. 3 (relevant portions excerpted). These layers of protection reflect the extraordinary value and sensitivity of Tesla's research and development efforts, particularly those like Tesla's Optimus, aimed at delivering far-reaching societal benefits.

25. Tesla also protects its confidential, proprietary, and trade secret information with stringent information security policies and practices. Physical security measures are designed to prevent unauthorized access to specific facilities and rooms within those facilities. For example, Tesla secures its physical facilities by limiting access only to authorized personnel through a badging system, in addition to monitoring access using security guards and cameras. Visitors to Tesla's facilities must check in with a receptionist or security guard, sign a nondisclosure agreement, and are photographed. Visitors must always be escorted by a Tesla employee.

26. Tesla's information security protections are also best-in-class. Tesla's network and servers are password-protected, firewall-protected, and accessible only to current Tesla employees with proper and, in some cases, restricted credentials. Employees are regularly exposed to learning and awareness on the proper use of Tesla's systems. Tesla assigns each employee unique credentials to log in to the network. Once they input those credentials to Tesla's network login page, they must further go through a two-factor authentication process to successfully log in to Tesla's network. The two-factor authentication requires the employee to register a secondary account that will receive an alert or a unique code that the employee must enter to successfully log in to Tesla's network. If, for example, a wrong password is entered, the secondary account used will receive an alert that an incorrect password was entered and someone attempted to log in to Tesla's network. Additionally, employees must agree to abide by Tesla's Mobile Device Policy, which prohibits logging into Tesla's internal SharePoint via a web browser.

27. Tesla's networks additionally are guarded by a team of security systems engineers that design and implement intrusion detection systems, security video systems, and access control systems.

28. While Tesla considers any access to be confidential access, Tesla further safeguards various categories of confidential and proprietary information within Tesla's electronic systems. *See* Ex. D. For example, Tesla restricts access to proprietary and confidential information so that

1  it is accessible only to those with a demonstrated need.  After an employee resigns or is
2  terminated, Tesla promptly deactivates that user's permissions.
3     29.   Unauthorized access to Tesla's information not only jeopardizes competitive
4  advantage but also threatens the broader mission of harnessing technology for human betterment.
5  Because of this, Tesla employees receive regular emails from Tesla's information security team with
6  reminders on best practices for safe handling of Tesla's proprietary information and safety updates.
7  For example, on August 29, 2024, Defendant Proception's Co-Founder and CEO, Jay Li, a then
8  Tesla employee and member of the Optimus team, received an email from Tesla's information
9  security team, titled "Security and Confidentiality," reminding Tesla's Optimus team of its
10 obligations regarding the protection of Tesla's intellectual property and the ramifications for failing
11 to adhere to these policies.  Ex. E.  And on his last day at Tesla, Li received and opened an email
12 from Tesla's information security team, titled "Tesla Business Data: Your Role in Protecting Our
13 Information," once again reminding Tesla employees of their obligation to protect Tesla's business
14 data.  Ex. F.
15     30.   On information and belief, Li disregarded these warnings.  As further alleged below,
16 the confidential, proprietary information that he improperly, and without authorization, accessed,
17 acquired, disclosed, and/or used is highly restricted and valuable information that he knew or should
18 have known was off limits to him at the time he misappropriated it.

19 **C.   Proception Founder and CEO, Jay Li, Accesses and Downloads Files Outside the Scope of His Employment In the Weeks, Days, and Hours Before His Departure from Tesla**

21     31.   Li was employed by Tesla from August 22, 2022, to September 13, 2024.  Li was
22 initially assigned to the Optimus sensor team and entrusted with highly confidential and
23 proprietary work product related to the project.  The Optimus sensor team's work includes
24 development of the Optimus hands.  However, on July 1, 2024, Li was reassigned to the Optimus
25 AP chest computer team.  Following his reassignment, Li *did not have any further responsibilities*
26 *related to Optimus sensors or hands*.

32. As a condition of his employment, Li entered into, among other onboarding agreements, the Tesla NDA. Ex. A. In addition to the safeguarding of information described above, the NDA contains an Assignment of Inventions provision. *Id.* at § 2.6. The provision provides, among other things, an express assignment:

> to the Company all [Li's] right, title and interest in and to any and all Inventions that (i) **are developed using equipment, supplies, facilities, trade secrets, or Proprietary Information of the Company**, (ii) result from work performed by [Li] for the Company, or (iii) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research and development of the Company (the "Company Inventions"). [Li] agree[d] to assign, and . . . irrevocably transfer and assign, to the Company all Proprietary Rights and Moral Rights in or with respect to any Company Inventions. [Li] forever waive[d] and agree[d] never to assert any and all Moral Rights [he] may have in or with respect to any Company Inventions, even after termination of [his] work on behalf of the Company.

(emphasis added). Li reaffirmed his commitment to the Tesla NDA and its Assignment of Inventions provisions on January 3, 2024. Ex. G at § 2.6.

33. Following Li's reassignment from the hand sensor team to the chest computer team on July 1, 2024, Li, without authorization, accessed highly sensitive and confidential Optimus hand-related files he no longer had a business need to access. Specifically, in the final weeks of his employment with Tesla, including the days leading up to both his anticipated and actual departure date, Li improperly accessed and downloaded—from his Tesla desktop computer and at least two smartphones—Optimus hand-related files unrelated to his job responsibilities, including highly sensitive and confidential Tesla files and source code related to Optimus's hand motion and actuators and confidential tactile sensing information. For example:

(a) On **July 13, 2024**, in violation of Tesla's Mobile Device Policy, Li surreptitiously logged into Tesla's SharePoint using a web browser on an iPhone. Li downloaded two files to the iPhone from the Optimus Gen4 Forearm FT Sensing SharePoint. These documents, containing sensor diagrams and specifications related to Optimus's hand motion and actuators, were squarely outside the scope of Li's employment as of that time.

(b) On **July 15, 2024**, Li accessed a working document on the Optimus SharePoint that included sensitive sensor and flex testing data and hand model iterations, which was information outside the scope of his work at the time.

(c) On **July 18, 23,** and **30, 2024**, Li repeatedly accessed an internal spreadsheet on the Optimus SharePoint with material, strength, and sensor design data and calculations.

(d) On **July 29, August 1,** and **August 2, 2024**, Li accessed a PowerPoint slide that included renderings of Tesla's Optimus Gen3.1 finger and data on cycle testing.

(e) On **August 22, 2024**, Li accessed Tesla's Optimus hand sensing SharePoint files in violation of Tesla's Mobile Device Policy by using a web browser on an Android phone. These files included a confidential 353-slide internal PowerPoint on tactile sensing in dexterous robot hands, motion and tension sketches and diagrams, material specifications, and feasibility studies. On this date, Li also accessed and downloaded several of Tesla's Optimus hand and forearm actuator modeling files.

(f) On **August 22, 24,** and **26, 2024**, Li again accessed files from Tesla's Optimus hand and forearm and sensing SharePoint folders. These files included confidential hand, sensor, and actuator source code, close-range videos and photos, and finger renderings that were wholly outside the scope of his duties at the time.

(g) On **September 3, 2024**, days before his first-anticipated departure date of September 6, Li accessed a dashboard that tracks current updates, tickets, and next steps pertaining to the development of Optimus hand and provides a roadmap of development milestones. He also accessed a PowerPoint that contains proprietary research and analysis, benchmarks, performance targets, equations, and sketches for a flexible sensor design for parts of the humanoid, including the hands.

(h) On **September 11-12, 2024**, Li accessed confidential documents containing requirements, measurements, and strategy related to Optimus hand motion actuators, as well as a confidential supplier list, close-range records of grip and tension tests conducted on robotic fingers, and confidential internal presentations on hand-related issues including glove strategy, forearm actuator, layout and architecture, design targets, technology options for flexible/searchable films,

sensing, thermal testing, and degrees of freedom. These files were squarely outside the scope of Li's employment as of that time.

        (i)       On **September 13, 2024**, Li's last day at Tesla (extended from the original date of September 6), he once again logged into Tesla's SharePoint in violation of Tesla's Mobile Device Policy by using a web browser on an Android phone. Li downloaded the same two files from Tesla's Optimus SharePoint he had improperly downloaded on July 13, 2024. Again, these documents contained diagrams and specifications related to Optimus's hand motion and actuators. Li also accessed Tesla's Optimus SharePoint files, including close-range recordings of front and side profiles of the Optimus robotic hand and movements, and vendor-supplied sketches of robotics materials. The close-range recordings, accessed by Li multiple times through his final day of employment, were created in the context—and for the purpose—of various internal development and testing scenarios, and capture specific improvements and details of the Optimus hand's joint and hinge movements. These files were squarely outside the scope of Li's employment as of that time.

        (j)       Also on **September 13, 2024**, Li stopped using his Tesla issued laptop as of 2:00 pm Pacific time. However, Li continued to access Tesla's SharePoint files from his phone until 8:55 pm Pacific time.

34. During this two-month period leading up to his departure, Li also conducted voluminous online searches from his Tesla desktop computer related to humanoid robotic hands, as well as searches related to venture capital ("VC") funding and startup resources, such as "Canaan Capital robotics," and "Stanfrod [sic] startup resources." His scheme was in motion at least as early as July 15, 2024, as the following searches show he was seeking funding for his secret venture at that time: "does YC fund companies," "bay area robotics incubator," and "does incubator provide funding."

35. The aforementioned documents improperly accessed and/or downloaded by Li contained measurements, tensions, ranges of motion, degrees of freedom, and other highly sensitive engineering specifications, all of which were the direct output of Tesla's substantial investments in research, development, and advancement of Optimus.

### D. Proception's Implausibly Rapid and Uncannily Similar Humanoid Robotic Hand

36. Defendant Proception was founded by Li and Jianxiang "Jack" Xu. Li is also Proception's CEO. Proception was incorporated on September 19, 2024—just six days after Li left Tesla.

37. On March 3, 2025, only five months after its founding, Proception touted that it had "successfully built" "advanced humanoid robotic hands."[5] Proception also claimed that "in the coming 9 months" it would make it "first shipments to research customers."[6] Absent specific know-how, this is an improbably fast development cycle. Moreover, Proception's expected shipments of its product to third parties in the coming months threatens imminent disclosure and further misappropriation of Tesla's trade secrets and confidential information.

38. Defendant Proception's ability to shortcut the typical development process is less surprising when one considers Li's improper conduct, described above, leading up to his departure from Tesla. The Tesla information Li improperly, and without authorization, accessed is very closely related to Proception's purportedly "advanced humanoid robotic hands." A YouTube video demonstrating the Proception hand functionality shows striking similarities in movement to Tesla's Optimus hand.[7]

39. Indeed, upon information and belief, and as described above, through Li's pilfering, Defendant Proception purportedly achieved in a matter of months what it has taken Tesla over four years, hundreds of employees, and billions of dollars to achieve. Proception's willful and intentional business tactics are implausible.

## FIRST CAUSE OF ACTION
**Federal Trade Secret Misappropriation**
**Defend Trade Secrets Act (18 U.S.C. §§ 1836, et seq.)**
**as to Proception (all relief) and Li (injunctive relief only)**

---

[5] https://www.ycombinator.com/launches/MvA-proception-ai-world-s-most-dexterous-humanoid
[6] *Id.*
[7] https://www.proception.ai/hand; https://www.youtube.com/watch?v=cEo4WlCanMc

40. Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

41. The confidential and proprietary information obtained by Defendant Proception through Li includes Tesla's trade secrets as defined in 18 U.S.C. § 1839(3). Based on Tesla's investigation to date, and subject to further investigation and discovery in this case, upon information and belief, Defendant Proception, as alleged herein, through Li, improperly acquired, and then further misappropriated Tesla's trade secrets related to its Optimus.

42. As described above and incorporated herein, Tesla engages in considerable effort to keep its confidential and proprietary information, including its trade secrets, secret and protected. Tesla's contractual measures, onboarding and regular training measures, and security and surveillance protocols all ensure reasonable measures are in place. And Tesla has not authorized the disclosure or use of any of its confidential and proprietary information, including its trade secrets, by any current or former Tesla personnel other than within his or her job scope and duties.

43. Tesla's confidential and proprietary information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to, or readily ascertainable by others through proper means, who can obtain economic value from the disclosure or use of the information.

44. Upon information and belief, Defendant Proception, through Li, improperly acquired, and then further misappropriated Tesla's confidential and proprietary information, including its trade secrets, through improper and unlawful means, and did so intentionally, willfully, and maliciously.

45. Upon information and belief, Defendant Proception misappropriated Tesla's confidential and proprietary information, including its trade secrets, and presents an ongoing threat of further misappropriation of those secrets because Proception knew, or had reason to know, that its acquisition of Tesla's confidential and proprietary information, including its trade secrets, was facilitated by former Tesla employee, Li, by improper means.

46. Upon information and belief, Defendant Proception is liable for Li's misappropriation of Tesla's confidential and proprietary information, including its trade secrets,

1 pursuant to the doctrine of respondeat superior because Proception knew, or should have known, of the misappropriation and Proception did nothing to prevent or stop it.  Upon information and belief, Proception is also liable for its own misappropriation of these trade secrets through other Proception employees.

47. Upon information and belief, Defendants Proception and Li derived economic value through their misappropriation and unauthorized use of Tesla's confidential and proprietary information, including its trade secrets.

48. Upon information and belief, if not enjoined, Defendants Proception and Li have misappropriated and will continue to misappropriate Tesla's confidential and proprietary information, including its trade secrets, for their own benefit and to the detriment of Tesla.

49. The direct and proximate result of Defendants Proception's and Li's misappropriation has caused, and, if not enjoined, will cause Tesla to continue to suffer irreparable and severe harm and injury, including in the form of lost business opportunities and disclosure of internal confidential and trade secret information to third parties, and monetary damages pursuant to 18 U.S.C. § 1836(b)(3)(B) in an amount exceeding $75,000 to be proven at trial.

50. Upon information and belief, because Defendant Proception's misappropriation was intentional, willful, and malicious, Tesla is entitled to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) in an amount equal to two times the amount of its compensatory damages as well as reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

51. Tesla's remedy at law is inadequate.  As a result, Tesla is entitled to, in addition to damages, preliminary and permanent injunctive relief pursuant to 18 U.S.C. 1836(b)(3)(A) against Defendants Proception's and Li's further misappropriation in order to protect Tesla's confidential and proprietary information, including its trade secrets, its goodwill and standing in the competitive marketplace, and its legitimate and legal business interests.

**SECOND CAUSE OF ACTION**
**State Trade Secret Misappropriation**
**California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426, et seq.)**
**as to Proception (all relief) and Li (injunctive relief only)**

52. Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

53. The confidential and proprietary information taken by Defendant Proception includes Tesla's trade secrets as defined in Cal. Civ. Code § 3426.1(d). Based on Tesla's investigation to date, and subject to further investigation and discovery in this case, upon information and belief, Defendant Proception, as alleged herein, through Li, misappropriated Tesla's trade secrets related to Tesla's Optimus.

54. As described and incorporated herein, Tesla engages in considerable effort to keep its confidential and proprietary information, including its trade secrets, secret and protected. Tesla's contractual measures, onboarding and regular training measures, and security and surveillance protocols all ensure reasonable measures are in place. And Tesla has not authorized the disclosure or use of any of its confidential and proprietary information, including its trade secrets, by any current or former Tesla personnel other than within his or her job scope and duties.

55. Tesla's confidential and proprietary information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to others who can obtain economic value from the disclosure or use of the information.

56. Upon information and belief, Defendant Proception, through Li, improperly acquired, and then further misappropriated Tesla's confidential and proprietary information, including its trade secrets, through improper and unlawful means. Upon information and belief, Proception's misappropriation was intentional, willful, and malicious.

57. Upon information and belief, Defendant Proception misappropriated Tesla's confidential and proprietary information, including its trade secrets, because Proception knew, or had reason to know, that its acquisition of Tesla's confidential and proprietary information, including its trade secrets, was facilitated by former Tesla employee, Li, by improper means.

58. Upon information and belief, Defendant Proception is liable for Li's misappropriation of Tesla's confidential and proprietary information, including its trade secrets, pursuant to the doctrine of respondeat superior because Proception knew, or should have known, of the misappropriation and Proception did nothing to prevent or stop it. Upon information and

belief, Proception is also liable for its own misappropriation of these trade secrets through other Proception employees.

59. Upon information and belief, Defendants Proception and Li derived economic value through their misappropriation and unauthorized use of Tesla's confidential and proprietary information, including its trade secrets.

60. Upon information and belief, if not enjoined, Defendants Proception and Li have misappropriated and will continue to misappropriate Tesla's confidential and proprietary information, including its trade secrets, for their own benefit and to the detriment of Tesla.

61. The direct and proximate result of Defendants Proception's and Li's misappropriation has caused, and, if not enjoined, will cause Tesla to continue to suffer irreparable and severe harm and injury, including in the form of lost business opportunities and disclosure of internal confidential and trade secret information to third parties, and monetary damages pursuant to Cal. Civ. Code § 3426.3 in an amount in excess of $75,000 to be proven at trial.

62. Upon information and belief, because Defendant Proception's misappropriation was intentional, willful, and malicious, Tesla is entitled to exemplary damages pursuant to Cal. Civ. Code § 3426.3 in an amount equal to two times the amount of its compensatory damages as well as reasonable attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

63. Tesla's remedy at law is inadequate. As a result, Tesla is entitled to, in addition to damages, preliminary and permanent injunctive relief pursuant to Cal. Civ. Code § 3426.2 against Defendants Proception's and Li's further misappropriation in order to protect Tesla's confidential and proprietary information, including its trade secrets, its standing in the competitive marketplace, and its legitimate and legal business interests.

### THIRD CAUSE OF ACTION

**Tortious Interference with Contract (as to Proception)**

64. Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

65. As described above and incorporated herein, Tesla and Li, among other agreements, specifically entered into Tesla's NDA. Tesla's NDA is a valid and enforceable contract. Tesla has

1  performed all its duties under the NDA. In return, Li received substantial consideration, including
2  salary, bonuses, and other incentives. Li remains bound by the terms of Tesla's NDA.

3      66.    Defendant Proception was aware of the existence of Li's agreements, including the
4  NDA, with Tesla.

5      67.    Upon information and belief, despite Defendant Proception's knowledge of the
6  existence of Tesla's agreements with Li, including its NDA, Proception intentionally engaged in
7  the acts alleged herein and offered Li outsized compensation in the form of equity or otherwise to
8  induce Li to breach his agreements with Tesla, including its NDA.

9      68.    As a direct and proximate result of Defendant Proception's actions, Li was induced
10 to breach, and did breach, his contractual obligations under his agreements with Tesla, including
11 its NDA, causing Tesla to suffer, and continue to suffer, damages in an amount to be proven at
12 trial.

13     69.    Additionally, as a direct and proximate result of Defendant Proception's
14 inducement of Li's breaches and interference, Tesla has suffered, and will continue to suffer,
15 immediate and irreparable harm. Tesla's irreparable harm is difficult to ascertain, and Tesla will
16 be without an adequate remedy at law and is, therefore, entitled to injunctive relief. Further, if
17 Proception is not enjoined, it will, on information and belief, continue to induce Li to breach his
18 agreements with Tesla, including its NDA, and to interfere with Tesla's agreements with Li.

### FOURTH CAUSE OF ACTION

**Quasi-Contract/Restitution (as to Proception)**

21     70.    Plaintiff repeats and hereby realleges the allegations above as if fully set forth
22 herein.

23     71.    Tesla is the rightful owner of its confidential information. As described above, Li,
24 through his employment with Tesla, gained access to Tesla's confidential information. This
25 confidential information was entrusted to Li in order, and solely, to perform his job
26 responsibilities. Li was compensated in exchange for his trust, access, and labor. Upon
27 information and belief, Li violated Tesla's trust and employment obligations by accessing
28 proprietary materials outside the scope of his authorized employment duties.

72. Upon information and belief, Li, improperly and without authorization, absconded with Tesla's confidential information and provided this information to Defendant Proception. Proception was aware that this information belongs to Tesla. Proception accepted and retained Tesla's information without authority or compensation. As described above, Proception has been unjustly enriched by the illegal receipt of Tesla's information by, for example, being able to develop a humanoid robotic hand in only five months.

73. Tesla has been, and will continue to be, damaged as a direct and proximate cause of Defendant Proception's illegal use of Tesla's confidential information. As a result, Tesla is entitled to a constructive trust by which Proception is found to have held Tesla's confidential information, and any inventions, technologies, or products emanating from that information, for the benefit of Tesla pursuant to Cal. Civ. Code. §§ 2223 and 2224.

## PRAYER AND RELIEF

WHEREFORE, Tesla respectfully requests that this Court enter:

(a) a judgement in favor of Tesla and against Defendant Proception on all of Tesla's claims asserted in this Complaint;

(b) compensatory and exemplary damages as proven at trial pursuant to Tesla's claims, including its trade secret claims, asserted in this Complaint;

(c) pre-judgment and post-judgment interest on all damages awarded;

(d) an order temporarily and preliminarily enjoining Defendant Li, his agents, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from directly or indirectly disclosing or using Tesla's confidential and proprietary information, including its trade secrets, and ordering Li to return to Tesla any and all documents and information that disclose, use, or reflect in any way Tesla's confidential and proprietary information, including its trade secrets;

(e) an order temporarily, preliminarily, and permanently enjoining Defendant Proception, its agents, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from directly or indirectly disclosing or

|   |   |   |
|---|---|---|
| | | using Tesla's confidential and proprietary information, including its trade secrets, and ordering Proception to return to Tesla any and all documents and information that disclose, use, or reflect in any way Tesla's confidential and proprietary information, including its trade secrets; |
| | (f) | establish a constructive trust and require Defendant Proception to transfer legal title to Tesla of any and all intellectual property, devices, machines, software, documents, or other objects or data that were developed or created using Tesla's confidential and proprietary information, including its trade secrets; |
| | (g) | reasonable attorneys' fees and costs pursuant to Tesla's claims, including its trade secret claims, asserted in this Complaint; |
| | (h) | Tesla's costs and expenses in this matter; and |
| | (i) | any and all such other and further relief as this Court may deem just and proper. |

## DEMAND FOR JURY TRIAL

Plaintiff Tesla, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

Dated: June 11, 2025

By: */s/ Josh Krevitt*
Josh Krevitt (State Bar No. 208552)

Attorney for Plaintiff
TESLA, INC.