GIBSON, DUNN & CRUTCHER LLP
JOSH KREVITT, SBN 208552
    jkrevitt@gibsondunn.com
310 University Avenue
Palo Alto, California 94301-1744
Telephone: 650.849.5300
Facsimile: 650.849.5333

ORIN SNYDER (admitted *pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

ANGELIQUE KAOUNIS, SBN 209833
    akaounis@gibsondunn.com
2000 Avenue of the Stars, Suite 1200N
Los Angeles, California 90067-4700
Telephone: 310.552.8500
Facsimile: 310.551.8741

*Attorneys for Plaintiff*
TESLA, INC.
_____

TESLA, INC.
TERRY W. AHEARN, SBN 216543
    tahearn@tesla.com
A. LOUIS DORNY, SBN 212054
    ldorny@tesla.com
KRISTA M. CARTER, SBN 225229
    kricarter@tesla.com
3000 Hanover Street
Palo Alto, California 94304
Telephone: 408.204.7384

*Attorneys for Plaintiff*
TESLA, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| TESLA, INC., a Texas Corporation<br><br>Plaintiff,<br><br>v.<br><br>PROCEPTION, INC., a Delaware Corporation, and ZHONGJIE "JAY" LI, an individual,<br><br>Defendants. | CASE NO. 5:25-cv-04963-SVK<br><br>**PLAINTIFF TESLA INC.'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION**<br><br>[*Declarations of Angelique Kaounis, Terry Ahearn, Jeff Liang, and Prem Pinto and [Proposed] Order filed concurrently herewith*]<br><br>Judge: The Honorable Susan van Keulen<br>Hearing Date: July 29, 2025<br>Time: 10:00 a.m. |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on July 29, 2025 at 10:00 A.M., or as soon thereafter as the parties may be heard, in the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, CA 95113, Plaintiff Tesla, Inc. ("Tesla") will, and hereby does, move this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

Tesla's motion seeks the following forms of injunctive relief, as set forth more fully in the Proposed Order submitted with this Motion, as required by Local Rules 65-2 and 7-2 to preserve the status quo:

1. An order prohibiting Defendants Proception, Inc. and Zhongjie "Jay" Li (together, "Defendants") from accessing, using, or disclosing Tesla's trade secrets and proprietary confidential information (as described herein);

2. An order prohibiting Defendants, and all of their employees and agents, from destroying, deleting, or concealing evidence potentially relevant to the claims or defenses in this action; and

3. An order halting Defendants from shipping any robotics product, or disseminating any technology or confidential information about any robotics product to third parties without prior order of this Court permitting such shipment or dissemination.

Tesla is concurrently filing a motion seeking expedited discovery from Defendants pursuant to Federal Rule of Civil Procedure 26(d)(1), to aid in the enforcement of a preliminary injunction, or, in the alternative, take discovery in support of further requests for preliminary relief as follows:

a. directing Defendants to permit Tesla's counsel and/or forensic examiner to inspect, image, and analyze any documents, computers, USB flash drives, or other electronic storage devices and accounts in Defendants' possession, custody or control that contain, or previously contained, (i) one or more of Tesla's trade secrets or confidential proprietary information, (ii) information relating to Tesla, or (iii) information relating to Defendants' development of robotics technology;

Gibson, Dunn & Crutcher LLP

b. directing Defendant's to respond to other written, oral or forensic discovery regarding Defendants' access, acquisition, use, and disclosure of Tesla's confidential information and trade secrets.

Tesla requests this motion be heard on the first available regularly noticed motion hearing date, given the imminent threat to its trade secrets and confidential information.  The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof; the declarations of Angelique Kaounis, Prem Pinto, Terry Ahearn, and Jeff Liang, along with supporting exhibits filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters of which the Court may take judicial notice.  Should expedited discovery unearth good cause, Tesla respectfully reserves the right to amend its preliminary injunction request.

DATED: June 16, 2025                              Respectfully submitted,

                                                 GIBSON, DUNN & CRUTCHER LLP


                                                 By:  */s/* Josh Krevitt
                                                 Josh Krevitt, Bar No. 208552
                                                    JKrevitt@gibsondunn.com
                                                 310 University Avenue
                                                 Palo Alto, CA 94301-1744
                                                 Telephone: 650.849.5300

                                                 Orin Snyder (admitted *pro hac vice*)
                                                    OSnyder@gibsondunn.com
                                                 200 Park Avenue
                                                 New York, NY  10166-0193
                                                 Telephone: 212.351.4000

                                                 Angelique Kaounis, Bar No. 209833
                                                    AKaounis@gibsondunn.com
                                                 2000 Avenue of the Stars, Suite 1200N
                                                 Los Angeles, CA  90067-4700
                                                 Telephone: 310.552.8500

                                                 *Attorneys for Plaintiff*
                                                 TESLA, INC.

Gibson, Dunn &
Crutcher LLP

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ....................................................................................................... 3

    1.    2021-Present: Tesla Invests To Develop A Humanoid Robot ...................... 3

    2.    Tesla Vigorously Protects Its Intellectual Property, Including Its Trade Secrets
          and Confidential Information ...................................................................... 4

    3.    Mid-July to Mid-September 2024: Li Accesses Sensitive Tesla Optimus Hand
          Files While Actively Planning His Competing Company ............................ 6

    4.    March 2025: Proception "Buil[ds]" "Advanced Humanoid Robotics Hands,"
          and Announces Plans to Distribute the Product. ........................................ 9

    5.    March-June 2025: Defendants Stonewall Tesla's Attempts To Secure Its IP ............. 9

III.  LEGAL STANDARD ............................................................................................. 11

IV.   ARGUMENT .......................................................................................................... 11

    1.    Tesla Is Likely To Succeed On The Merits Of Its Trade Secrets and Tortious
          Interference Claims ................................................................................... 11

    2.    Tesla Has Suffered And Will Continue To Suffer Irreparable Harm Without
          An Injunction. ........................................................................................... 21

    3.    The Balance Of Equities And Public Interest Favor An Injunction............................ 23

    4.    The Court Should Not Set A Bond ............................................................. 24

    5.    Expedited Discovery ................................................................................. 25

V.    CONCLUSION ....................................................................................................... 25

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND
EXPEDITED DISCOVERY

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acrisure of California, LLC v. Comfort Ins. Servs., LLC*,
  2020 WL 8575185 (S.D. Cal. Nov. 24, 2020) ................................................................15

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018) ..........................................................................18

*Bambu Franchising, LLC v. Nguyen*,
  537 F. Supp. 3d 1066 (N.D. Cal. 2021) .........................................................................16

*Beluca Ventures LLC v. Einride Aktiebolag*,
  660 F. Supp. 3d 898 (N.D. Cal. 2023) .....................................................................12, 15

*Citibank, N.A. v. Mitchell*,
  2024 WL 4906076 (N.D. Cal. Nov. 26, 2024) ...............................................................25

*Comet Techs. United States of Am. Inc. v. Beuerman*,
  2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) .............................................14, 17, 21, 25

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
  444 F. Supp. 3d 1198 (E.D. Cal. 2020) ........................................................................17

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ........................................................................................11

*E. W. Bank v. Shanker*,
  2021 WL 3112452 (N.D. Cal. July 22, 2021) ...........................................................14, 24

*ESG Cap. Partners, LP v. Stratos*,
  828 F.3d 1023 (9th Cir. 2016) ......................................................................................21

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
  2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ..............................................................18

*Forro Precision, Inc. v. Int'l Bus. Machines*,
  673 F.2d 1045 (9th Cir. 1982) ......................................................................................14

*Fujikura Composite Am., Inc. v. Dee*,
  2024 WL 3261214 (S.D. Cal. June 28, 2024) ...........................................................23, 24

*Gallagher Benefits Servs., Inc. v. De La Torre*,
  2007 WL 4106821 (N.D. Cal. Nov. 16, 2007), *aff'd in relevant part*, 283 F. App'x
  543 (9th Cir. 2008) .......................................................................................................23

*Genentech, Inc. v. JHL Biotech, Inc.*,
  2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) .................................................................22

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ...................................................................17, 23

Gibson, Dunn &
Crutcher LLP

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND
EXPEDITED DISCOVERY

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ........................................................................20

*Invisible Narratives v. Next Level Apps Tech. - FZCO*,
   2025 WL 551866 (N.D. Cal. Feb. 19, 2025) ...................................................21

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009)........................................................................25

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
   941 F.2d 970 (9th Cir. 1991)..........................................................................22

*MBS Eng'g Inc. v. Black Hemp Box, LLC*,
   2021 WL 2458370 (N.D. Cal. June 16, 2021) ...............................................16

*Museum of Handcar Tech. LLC v. Trans. Agency for Monterey Cnty.*,
   2025 WL 1114458 (N.D. Cal. Apr. 14, 2025) ................................................11

*Netlist Inc. v. Diablo Techs. Inc.*,
   2015 WL 153724 (N.D. Cal. Jan. 12, 2015) ...................................................23

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) ..................................................................................20

*Power Integrations, Inc. v. De Lara*,
   2020 WL 1467406 (S.D. Cal. Mar. 26, 2020) ................................................19

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (Cal. 2004) .........................................................................20

*SolarPark Korea Co. v. Solaria Corp.*,
   2023 WL 4983159 (N.D. Cal. Aug. 2, 2023)......................................22, 23, 24

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
   617 F. Supp. 2d 938 (N.D. Cal. 2007) ...........................................................16

*W. Directories, Inc. v. Golden Guide Directors, Inc.*,
   2009 WL 1625945 (N.D. Cal. June 8, 2009) ..................................................21

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 2123560 (2017).....................................................................22, 23, 24

*WeRide Corp. v. Kun Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019) ....................................11, 12, 13, 14, 15, 18

*whiteCryption Corp. v. Arxan Techs., Inc.*,
   2016 WL 3275944 (N.D. Cal. June 15, 2016) ................................................21

**Statutes**

18 U.S.C. § 1839(5)(A)...................................................................................16

18 U.S.C. § 1839(5)(B)...................................................................................16

18 U.S.C. § 1839(6)(A)...................................................................................16

Cal. Civ. Code § 3426.1(a)..................................................................................................16

Cal. Civ. Code § 3426.1(b)(1)............................................................................................16

Cal. Civ. Code § 3426.1(b)(2)............................................................................................16

Cal. Civ. Code § 3426.2......................................................................................................11

Cal. Civ. Proc. Code § 2019.210........................................................................................12

California Uniform Trade Secrets Act (Cal. Civ. Code § 3426.1)......................................11

Defend Trade Secrets Act (18 U.S.C. § 1836) ..................................................................11

U.S. Code § 1836(b)(3)(A)(i) ............................................................................................11

**Rules**

Federal Rule of Civil Procedure 26(d)(1) ..........................................................................25

Federal Rule of Civil Procedure 65....................................................................................24

Gibson, Dunn &
Crutcher LLP

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND
EXPEDITED DISCOVERY

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case involves the misappropriation of critical trade secrets relating to the development of Tesla Inc.'s ("Tesla") humanoid robot ("Optimus")—a revolutionary advance in robotics technology that will alleviate humans' need to perform taxing, repetitive, and dangerous tasks, all designed to improve humans' quality of life.  Tesla's Optimus is the result of extraordinary investment and innovation, and it embodies scores of groundbreaking and tightly guarded trade secrets.  Defendant Zhongjie "Jay" Li, a former Tesla employee, stole Optimus trade secrets.  Tesla brought this action to stop further misappropriation and irreparable harm. This motion seeks limited relief to preserve the status quo to (1) prevent the dissemination of Tesla's confidential information and trade secrets, (2) identify recipients of that information to prevent its further dissemination, (3) halt Defendants' shipment or dissemination of any disputed product or information without prior order of this Court, and (4) preserve critical evidence.  In short, Tesla asks the Court to compel the Defendants to comply with the trade secret laws by not disclosing or using Tesla's trade secrets and cooperating with a reasonable investigation to confirm their compliance with the same—something they have refused to do thus far.

The particular Tesla Optimus technology and trade secrets at issue here relate to robotic hand functionality.  That is among the most challenging to develop, as it requires the delicate balancing of sensitivity of touch, freedom of range of motion, weight of appendage, and strength of grasp, among other things.[1]  Development of this pioneering technology has required vision, trial and error, and enormous resources.  To support this extraordinary effort, teams of specialized engineers, artificial intelligence ("AI") researchers, robotics experts, and manufacturing specialists have been dedicated solely to Tesla's Optimus project.  Tesla's investment—estimated to be in the billions of dollars—has, after years of effort, resulted in trade secrets and other proprietary information of enormous value.

---

[1] Decl. of A. Kaounis ("Kaounis Decl."), Ex. A (describing work regarding "extended tactile sensing integration," "very fine controls through tendons, and shaving [] weight off the forearm").

Gibson, Dunn & Crutcher LLP

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

Li stole Tesla's Optimus trade secrets on his way out the door. Then, armed with those trade secrets, Li launched his new company, Defendant Proception, Inc. ("Proception"). Tesla is likely to prevail in showing that Li's company and the product it has developed are based on Tesla's stolen trade secrets. Tesla is also likely to succeed in showing that this misappropriation was intentional and unlawful—and threatens to inflict grave and irreparable harm on Tesla.

The timing of Li's conduct is critical, and damning. On August 22, 2022, Li began working for Tesla as part of the Optimus sensor team, which included development of the Optimus hands. He was entrusted with highly confidential and proprietary work product related to that aspect of the project. On July 1, 2024, Li was reassigned to the Tesla Optimus chest computer team, meaning he no longer had any responsibilities related to Optimus sensors or hands. Yet in the months that followed, Li repeatedly accessed and downloaded highly sensitive and confidential Tesla Optimus hand-related files including source code, specifications, feasibility studies, and test results. Li had no Tesla-related reason to access any of this confidential information, yet he accessed one 353-page PowerPoint *roughly 65 times*. And he continued to access such files—unrelated to his work—through his very last day at the company (September 13, 2024) while simultaneously searching for funding for his new venture.

Less than a week after leaving Tesla, Li co-founded a competing robotics company called Proception. Only five months after that, Proception touted that it had already "successfully built" "advanced humanoid robotic hands," which it promised to ship to research customers in the coming months. Proception's alarming and impossibly rapid development of extraordinarily complicated technology—all shortly after Li left Tesla having repeatedly and unjustifiably accessed relevant files—manifests the theft and use of Tesla's highly valuable trade secrets, and threatens their dissemination to others who will be working with Proception.

Tesla welcomes fair competition. But the claim that Proception independently "developed" advanced humanoid robotic hands in under five months, with a team of just five people, defies reality. That is not innovation—it is fiction.

When Proception's accelerated timeline and minimal independent resources are considered alongside Li's repeated access to, and downloading of, Tesla's most sensitive

materials, the conclusion is inescapable: Proception's business has been built on Tesla's confidential information and trade secrets. Tesla respectfully requests that the Court grant an injunction to preserve the status quo and to halt the unlawful use of Tesla's valuable IP.

## II.    BACKGROUND

**1.    2021-Present: Tesla Invests To Develop A Humanoid Robot**

Founded in 2003, Tesla has emerged as a global leader in the design, development, and manufacture of electric vehicles and sustainable energy production and storage. In recent years, Tesla has committed significant funding and human resources to the Optimus project, a cutting-edge initiative to develop a general purpose, bi-pedal, autonomous humanoid robot capable of performing everyday tasks—such as caregiving, teaching, lawn maintenance, and even grocery shopping, among other things. *See* Kaounis Decl., Ex. C at 8; *see also id.*, Ex. D.

To enable Optimus to perform repetitive, physically demanding, and even hazardous work, Tesla has built a comprehensive robotic learning system that leverages AI to execute complex physical tasks. Kaounis Decl., Ex. E (noting Tesla's efforts to "design[], train[] and deploy[] some of the first end-to-end neural nets for humanoid robots ever demonstrated to autonomously perform tasks requiring coordinated control of humanoid torso, arms, and full hands with fingers"). These tasks include, among other things, full-body locomotion, precise manipulation, and eventual deployment in real-world production environments. *See* Kaounis Decl., Ex. E; *see also id.*, Ex. F at 10. It has taken Tesla several years of hard work and significant investment to develop the necessary hardware and software stacks that enable balance, navigation, perception and interaction with the physical world. *See* Kaounis Decl., Ex. F at 10; *see also id.*, Ex. G at PDF p. 4.

Since Tesla first announced the Optimus project in 2021, it has hired scores of specialized engineers, AI researchers, robotics experts, and manufacturing specialists dedicated solely to this endeavour. Declaration of Prem Pinto ("Pinto Decl.") ¶ 4. It is also estimated that Tesla has already invested billions of dollars in research and development for the Optimus project. *See* Kaounis Decl., Exs. H, I, J, K. Tesla's investment of substantial time and financial and human capital to this ambitious project reflects its significance, as well as the competitive

market conditions in which multiple startups, established players, and vehicle manufacturers compete for technological advantage. *See generally* Kaounis Decl., Ex. L.

**2.    Tesla Vigorously Protects Its Intellectual Property, Including Its Trade Secrets and Confidential Information**

To protect its proprietary technology, Tesla implements rigorous security protocols consisting of contractual, physical, and digital controls. To begin, all Tesla employees must sign a non-disclosure agreement ("NDA") as part of their onboarding, through which the employees pledge, among other things, to not disclose Tesla's "Proprietary Information," defined to include "all information, in whatever form and format, to which [they] have access by virtue of and in the course of [their] employment." Declaration of Terry Ahearn ("Ahearn Decl.") ¶ 5; Ex. A, § 1. Here, Defendant Li agreed to the Tesla NDA in 2022 and reaffirmed his commitment to the Tesla NDA and its Assignment of Inventions provisions on January 3, 2024. Ahearn Decl., Ex. B §§ 1; 2.6. In addition, as a condition of employment, Tesla employees agree to be bound by Tesla's Code of Business Ethics, which requires employees to protect Tesla's confidential and proprietary information and trade secrets. Ahearn Decl. ¶ 6; Ex. C. Further, Tesla's Social Media Guidelines specifically prohibit disclosure of "Tesla's trade secrets, products or Tesla Business Data or of any manufacturing process." Ahearn Decl. ¶ 6; Ex. D at 6.

Tesla's physical security measures are designed to prevent unauthorized access to specific facilities and rooms within them. For example, Tesla secures its physical facilities by limiting access only to authorized personnel, using a badging system, and monitoring access through security guards and cameras. Declaration of Jeff Liang ("Liang Decl.") ¶ 9. Visitors are required to check in with reception or security and to sign a nondisclosure agreement, and they are photographed. *Id.* Visitors must always be escorted by a Tesla employee. *Id.*

Tesla's information security protections are also best-in-class. Tesla's network and servers are password-protected, firewall-protected, and accessible only to current Tesla employees with proper and, in some cases, restricted credentials. *Id.* ¶ 10. Employees are regularly exposed to learning and awareness on the proper use of Tesla's systems. Tesla assigns each employee unique credentials to log in to the network. *Id.* To access the network,

employees must enter their unique credentials and satisfy a two-factor authentication process—a process that requires the employee to register a secondary account that will receive an alert or a unique code that the employee must enter to successfully log in to Tesla's network.  *Id.* Additionally, employees must agree to abide by Tesla's Mobile Device Policy, which prohibits logging into Tesla's internal SharePoint via a web browser.  *Id.*; Liang Decl., Ex. B.

In addition to all those user-facing controls, Tesla employs a team of security systems engineers that guard Tesla's networks by designing and implementing intrusion detection systems, security video systems, and access control systems.  Liang Decl. ¶ 11.  While Tesla considers any access to be confidential access, Tesla further safeguards various categories of confidential and proprietary information within Tesla's electronic systems.  *See* Liang Decl., Ex. C.  Moreover, Tesla restricts access to proprietary and confidential information—including information related to the Optimus project—so that it is accessible only to those with a demonstrated need.  Liang Decl. ¶ 12; Pinto Decl. ¶ 3.  When an employee's device accesses Tesla's servers, networks, or other company-related software, that activity can be tracked along with the devices' unique identifier in logs accessible to the information security team for review.  Liang Decl. ¶ 4.  After an employee resigns or is terminated, Tesla promptly deactivates that employee's permissions.  *Id.* ¶ 12.

Beyond these many protections, Tesla's information security team regularly emails employees with reminders on best practices for handling sensitive information and safety updates.  *Id.* ¶ 13.  Employees also receive regular reminders of their obligations to protect Tesla's intellectual property and the consequences of falling short of those obligations.  *Id.*  Here, just two weeks before his departure, Defendant Li was explicitly reminded by Tesla's information security team of his obligations to protect Tesla's intellectual property and the ramifications for failing to do so.  Liang Decl., Ex. D.

3.   **Mid-July to Mid-September 2024: Li Accesses Sensitive Tesla Optimus Hand Files While Actively Planning His Competing Company**

Li was employed by Tesla from August 14, 2022 to September 13, 2024.  Ahearn Decl. ¶ 4.  Li started his employment with Tesla on the Optimus sensor team, until he was transitioned to the chest computer team on July 1, 2024.  Ahearn Decl. ¶ 4; Pinto Decl. ¶ 5.

In the final two months of his employment, and after his reassignment, Li—despite lacking a legitimate business need—used his Tesla desktop computer and his personal smartphones to repeatedly access and download files related to the Optimus hand sensor and actuator.  Pinto Decl. ¶ 5; Liang Decl. ¶ 6.  Those files contain confidential information related to the development of Tesla's Optimus Gen4 hand, the component of the humanoid robot considered by the robotics industry to be the most challenging to develop.  Pinto Decl. ¶ 5. *At the same time that Li was repeatedly accessing and downloading these confidential files (mid-July-to-September), Li also conducted numerous online searches from his Tesla desktop computer seeking venture capital funding and startup resources*.  Liang Decl. ¶ 7.

By way of example, Li accessed or downloaded the following files (Liang Decl. ¶ 6; Ex. A), all of which were outside the scope of his work on the chest computer team (Pinto Decl. ¶ 5), on the following dates:

(a)    **July 13, 2024.**  Li downloaded two files from Tesla's SharePoint, *containing sensor diagrams and specifications* related to Optimus's hand motion and actuators.  Liang Decl., Ex. A at Tab A; Pinto Decl. ¶ 5(a).  A competitor could use these documents to copy the hand model or gain a head start on modeling a competitive robotic hand using the same or similar parameters outlined in these documents.  *Id.*

(b)    **July 15, 2024.**  Li accessed a working document on the Optimus SharePoint that included sensitive sensor and flex testing data and hand model iterations.  Liang Decl., Ex. A at Tab B; Pinto Decl. ¶ 5(b).  A competitor could leverage this data to unfairly accelerate their hand sensor and flexibility testing and gain a significant advantage in robotic hand development.  *Id.*

(c)    **July 18, 23 and 30, 2024.**  Li repeatedly accessed an internal spreadsheet on the Optimus SharePoint with material, strength, and sensor design data and calculations.  Liang

Decl., Ex. A at Tab C; Pinto Decl. ¶ 5(c).  A competitor with access to sensitive sensor data could utilize this information to duplicate Tesla's Optimus proprietary hand sensor design without the associated research and development costs.  *Id.*

(d)     **July 29, August 1 and 2, 2024.**  Li accessed a PowerPoint slide that included renderings of Tesla's Optimus Gen3.1 finger and data on cycle testing.  Liang Decl. Ex. A at Tab D; Pinto Decl. ¶ 5(d).  A competitor with access to these renderings and data could significantly advance its development of robotic fingers, including by potentially shortcutting failure rate testing.  *Id.*

(c)     **August 22, 2024.**  Li accessed Tesla's Optimus hand sensing SharePoint files containing a *confidential 353-slide internal PowerPoint on tactile sensing in dexterous robot hands, motion and tension sketches and diagrams, material specifications, and feasibility studies*.  Liang Decl., Ex. A at Tab F; Pinto Decl. ¶ 5(e).  A competitor could use this presentation to understand the goals and takeaways of Tesla's extensive grasp, position tracking, and force/friction studies for robotic hands.  *Id.*  On this date, Li also accessed and downloaded several of Tesla's Optimus Hand & Forearm Actuator modeling files.  A competitor could use these documents to reconstruct Optimus's hand actuator model or gain a head start on modeling a competitive robotic hand.  *Id.*

(e)     **August 22, 24, and 26, 2024**.  Li again accessed files from Tesla's Optimus hand and forearm and sensing SharePoint folders.  Liang Decl., Ex. A at Tab F.  These files included confidential hand, sensor, and actuator source code, close-range videos and photos, and finger renderings that were wholly outside the scope of his duties at the time.  Pinto Decl. ¶ 5(e).  A competitor could use these code files and internal documents to reconstruct the Optimus hand hardware and model or gain a significant advantage on modeling and development of a robotic hand.  *Id.*

(f)     **September 3, 2024.**  Li accessed a dashboard that tracks current updates, tickets, and next steps pertaining to the development of Optimus hand and provides a *roadmap of development milestones*; he also accessed a PowerPoint that contains *proprietary research and analysis, benchmarks, performance targets, equations, and sketches* for a flexible sensor design

for humanoid parts, including the hands.  Liang Decl., Ex. A at Tab G; Pinto Decl. ¶ 5(f).  A competitor could use this information to eliminate months, if not years, of trial and error that otherwise would need to be done to establish a viable product development roadmap, performance targets, and feasibility of design, among other things.  *Id.*

(g)    **September 11–12, 2024.**  Li accessed confidential documents containing *requirements, measurements, and strategy* related to Optimus's hand motion and actuators, a *confidential supplier list*, and *close-range recordings of grip and tension tests* conducted on robotic fingers and confidential internal presentations on hand-related issues including *glove strategy, forearm actuator layout and architecture, design targets, Technology options for flexible / stretchable films, sensing, thermal testing and degrees of freedom*.  Liang Decl., Ex. A at Tab H; Pinto Decl. ¶ 5(g).  A competitor could use this information to shortcut the robot hand design process and the selection of materials for the hand and learn which external packaging is most and least viable for various portions of a robotic hand and arm.  *Id.*  Separately, a competitor could use the supplier file to shortcut the supplier research process to obtain the same or similar supplies to compete with Tesla, including at cheaper prices to undercut Tesla's pricing.  *Id.*

(h)    **September 13, 2024**.  On his last day at Tesla, Li downloaded the same two files from Tesla's Optimus SharePoint that were downloaded on July 13, 2024.  Again, these documents contained *diagrams and specifications* related to Optimus's hand motion and actuators.  *See* Liang Decl., Ex. A at Tab I; Pinto Decl. ¶ 5(h).  Li also accessed Optimus Gen 4 Forearm FT sensing, hand, and actuator files, including *close-range recordings of front and side profiles of the Optimus robotic hand and movements*, and vendor-supplied sketches of robotics materials.  *See* Liang Decl., Ex. A at Tab J; Pinto Decl. ¶ 5(i).  The close-range recordings, accessed by Li multiple times through his final day of employment, were created in the context— and for the purpose—of various internal development and testing scenarios, and capture specific improvements and details of the Optimus hand's joint and hinge movements.  *Id.*  A competitor with recurring access to these recordings could glean confidential information about the hand joint and hinge design required to expand degrees of freedom, an ongoing challenge facing robotic hand development.  *Id.*

Li resigned from Tesla on September 13, 2024.  Ahearn Decl. ¶ 4.

**4.      March 2025: Proception "Buil[ds]" "Advanced Humanoid Robotics Hands," and Announces Plans to Distribute the Product.**

Just six days after leaving Tesla, on September 19, 2024, Li incorporated a competing company—Defendant Proception, of which he serves as CEO.  The company website shows only five employees.  *See* Kaounis Decl., Ex. B.  Yet roughly five months after its formation, Proception announced that it had "successfully built" "advanced humanoid robotics hands." Ahearn Decl., Ex. F at 1.  Proception touted this development of its "first functional prototype in just 4 months" as "an incredible milestone."  *Id.*  Proception also promised that "in the coming 9 months," it would make its "first shipments to research customers."  *Id.* at 3.  As part of its "master plan," Proception stated that it would "[c]ollaborate with research labs for validation and feedback." Ahearn Decl., Ex. I at PDF p. 2-3.

Around the same time Proception and Li announced their prototype, they also published a YouTube video demonstrating its functionality; that video shows striking similarities in movement to Tesla's Optimus hand.  Pinto Decl. ¶ 6.  Proception also gave molds of their robotic hands to investors as "gifts."  Ahearn Decl., Ex. H.  Another Y Combinator-backed startup called Proception the "most oversubscribed company in the . . . batch" at the Y Combinator 2025 demo day (Ahearn Decl., Ex. G)—underscoring the growing competitive field in which Proception seeks to operate.

**5.      March-June 2025: Defendants Stonewall Tesla's Attempts To Secure Its IP**

The suspicious timing of Proception's announcement was a huge red flag.  So Tesla reached out to Li to address and stop the misappropriation of Tesla's highly confidential and proprietary information related to the Optimus project.  Tesla notified Li that "Tesla has evidence that after [his] reassignment from the Optimus Sensor Team to the Optimus AP Computer Team [he] continued to improperly access and download information—including to non-Tesla devices—that was unrelated to [his] assigned work."  Ahearn Decl. ¶ 9 & Ex. J at PDF p. 3. Tesla specified that "[t]his Tesla information included, but is not limited to, hand and manipulation data, source code, confidential vendor information, and technical specifications,

all containing highly sensitive and non-public information belonging to and concerning Tesla." *Id.*  Tesla told Li that "[t]his access to Tesla information was unauthorized and improper" in connection with "the Proception product which [he] began developing at Tesla, and which Proception now offers under a suspiciously short timeline." *Id.*  Tesla explained its position that Li's actions "breach[ed] Tesla's confidentiality and security policies and [his] ongoing obligations to Tesla as a former employee and constitute[d] violations of several laws." *Id.*

Tesla requested that Li take the following measures to prevent further wrongdoing: (1) identify, secure, and preserve all Tesla-related information in his or Proception's custody or control and suspend all document deletion or destruction protocols Proception has in place; (2) provide confirmation that all potentially relevant and responsive information has been securely segregated and preserved in a forensically sound manner to prevent any misuse of Tesla's highly sensitive and non-public information and provide to Tesla a copy of all such information; and (3) cease and desist all attempts by him or Proception to unfairly compete with Tesla by seeking, using, or disclosing Tesla-related information.  *Id.* at PDF p. 2–3.

The parties' attorneys then spoke by phone to address Tesla's concerns, and Defendants' counsel agreed to follow up regarding whether his clients would comply with Tesla's requests. Ahearn Decl. ¶ 12 & Ex. L.  Their next call, however, made clear that Defendants were unwilling to provide any assurances that they would compete fairly and lawfully with Tesla's Optimus in the humanoid-robotics market.  *Id.*  Tesla asked Defendants to reconsider their position by 5:00 pm on Wednesday, April 23, 2025.  *Id.*  On April 21, 2025, Defendants requested further information about the specific proprietary information that Tesla believes was misappropriated or accessed without authorization and asserted that they could not reasonably evaluate Tesla's requests without more specific information regarding the alleged wrongdoing.  *Id.*  Defendants' counsel declined to provide any forensic analysis or other objective information to demonstrate that Defendants were not in possession of, and did not use or disclose, Tesla's confidential and proprietary information or trade secrets.  *Id.*  Tesla hired outside counsel who, on June 9, 2025, contacted Li's counsel, only to be referred to another lawyer who thus far has been unable to provide Tesla assurances that its trade secrets are not being used or disclosed.  Kaounis Decl. ¶¶

15–17 & Ex. Q. Tesla was thus forced to bring this action and seek preliminary injunctive relief to preserve the status quo, protect against the further misappropriation of its intellectual property, preserve the secrecy of its trade secrets, and prevent Defendants from unfairly competing using Tesla's trade secrets.

## III.    LEGAL STANDARD

"A party can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks omitted) (alterations adopted). Alternatively, even if all four factors are not demonstrated, "[a] preliminary injunction may also be appropriate if a movant raises serious questions going to the merits and the balance of hardships tips sharply towards it, as long as the second and third factors are satisfied." *Id.*

## IV.    ARGUMENT

**1.    Tesla Is Likely To Succeed On The Merits Of Its Trade Secrets and Tortious Interference Claims[2]**

### A.    Tesla Is Likely To Succeed On Its Trade Secret Claims

Tesla is likely to prevail on its trade secrets claims under the federal Defend Trade Secrets Act (18 U.S.C. § 1836) and the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426.1). Both laws expressly authorize injunctive relief in cases of "actual or threatened misappropriation." 18 U.S. Code § 1836(b)(3)(A)(i); Cal. Civ. Code § 3426.2. Both require the plaintiff to show "[1] that it possessed a trade secret, [2] that the defendant misappropriated the trade secret, and [3] that the defendant's conduct damaged the plaintiff." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019). Tesla will succeed in showing that all three elements are clearly satisfied: Tesla will show that Defendants misappropriated Tesla's trade

---

[2] Tesla does not include its fourth cause of action (for quasi-contract/restitution) in the current motion, as it is well established that a plaintiff "does not need to show a likelihood of success on every claim in order to obtain a preliminary injunction." *Museum of Handcar Tech. LLC v. Trans. Agency for Monterey Cnty.*, 2025 WL 1114458, at *8 n.8 (N.D. Cal. Apr. 14, 2025).

Gibson, Dunn & Crutcher LLP

secrets (highly sensitive information about the Optimus hand technology) by first stealing them, and then illicitly using them to build a competing business and product to Tesla's detriment. *See infra* § IV.A.2. Tesla will show that such misappropriation of sensitive trade secrets has caused—and, unless stopped, will continue to cause—Tesla irreparable harm. *See infra* § IV.2.[3]

### 1. Tesla Possesses Valuable Trade Secrets

The various information improperly accessed and/or downloaded by Li constitutes "trade secrets" under both state and federal law. A "trade secret" is information that (a) "derives independent economic value, actual or potential, from not being generally known to, or readily ascertainably by other people who can obtain economic value from its disclosure or use," and (b) "is subject to reasonable efforts to maintain its secrecy." *WeRide*, 379 F. Supp. 3d at 845–46 (citations omitted). Both factors are clearly satisfied here.

As a threshold matter, Tesla has identified its stolen trade secrets with "reasonable particularity." Cal. Civ. Proc. Code § 2019.210. A plaintiff need not "spell out the details" of the alleged trade secrets but need only "provide sufficient identification so that the court and the defendant may ascertain at least the boundaries within which the secret lies." *WeRide*, 379 F. Supp. 3d at 846 (internal quotation marks omitted). Tesla has more than satisfied this requirement by identifying *specific* documents that were misappropriated and explaining that those documents contained highly sensitive (1) engineering specifications, schematics, and blueprints, including measurements, grips, tensions, ranges of motion, degrees of freedom, (2) tests, their results, and technical analyses, (3) models, (4) product roadmaps, (5) close-range video profiles of prototypes, (6) strategy documents, (7) vendor research, and (8) source code related to Optimus's hand motion and actuators, all of which are highly valuable and confidential information regarding the Optimus project. Liang Decl. ¶ 6, Ex. A; Pinto Decl. ¶ 5; *see Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023) (identifying "categories of information" is sufficient "where the complaint alleges that these categories of information are contained within specific documents").

---

[3] To avoid unnecessary repetition, the third element of the trade secrets claim is discussed only in the irreparable harm section of this motion.

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

Gibson, Dunn &
Crutcher LLP

***Tesla's Optimus Trade Secrets Derive Value from Not Being Generally Known or Readily Ascertainable.*** Tesla's trade secrets derive great value precisely because such information is not generally known or readily ascertainable, but instead is the heavily guarded fruit of deep financial investment and years of dogged pursuit. Pinto Decl. ¶ 5. The files at issue contain confidential information related to the development of Tesla's Gen4 hand—the component of the humanoid robot considered by the robotics industry to be the most challenging to develop. *Id.* The Tesla Optimus team keeps this information in the strictest of confidence as it is the product of years of research and development—including design, testing, refinement, and Q/A—and implicates advanced methods of tactile sensing, tendon control, and actuation not generally known to the greater industry and public. *Id.* Where such information—like the source code at issue here—was created only through large investment, courts have found such information, once secured, to have significant value. *See, e.g.*, *WeRide*, 379 F. Supp. 3d at 847 (explaining that "source code has value" because "many engineers developed [it] over 18 months with investments of over $45 million," and because the confidential source code gave the plaintiff "an advantage over competitors").

If competitors were to gain access to this information, they would gain a significant advantage in the development of a robotic hand (as well as other robotic parts implicating tactile sensing, tendon control, and actuation) and in turn, the humanoid robotics market, at the expense of Tesla's years of labor and investment. Pinto Decl. ¶ 5. As explained in detail above, a competitor could use the documents containing sensor diagrams and specifications or Tesla's Optimus Hand & Forearm Actuator modeling files to copy Tesla's Optimus hand model or gain a head start on modeling a competitive robotic hand using the same or similar parameters outlined in these documents. *Id.* ¶ 5(a)–(b). Separately, a competitor could use the information at issue to glean Tesla's strategies. For example, a competitor could use the confidential 353-slide internal PowerPoint on tactile sensing in dexterous robot hands, motion and tension sketches and diagrams, material specifications, and feasibility studies to understand the goals and takeaways of Tesla's extensive grasp, position tracking, and force/friction studies for robotic hands. *Id.* ¶ 5(e). Likewise, a competitor could use the dashboard and its roadmap of

development milestones, as well as presentations that contain proprietary research and analysis, benchmarks, performance targets, equations, and sketches for a flexible sensor design for humanoid parts, to eliminate months, if not years, of trial and error that otherwise would need to be done to establish a viable product development roadmap, performance targets, and feasibility of design, among other things.  Pinto Decl. ¶ 5(f); *see also id.* at ¶ 5(g) (discussing confidential internal glove strategy, forearm actuator layout and architecture, design targets, Technology options for flexible and stretchable films, sensing, thermal testing and degrees of freedom).  And finally, a competitor could use information concerning technology options for flexible and stretchable films, as well as Tesla's Optimus confidential supplier list, to shortcut the selection of effective materials and suppliers and to obtain the same or similar supplies to compete with Tesla, including at cheaper prices to undercut Tesla's pricing.  Pinto Decl. ¶ 5(g).  In short, if other companies, including competitors, are given access to this information, its value would diminish and Tesla's "competitive edge would evaporate."  *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018).

The value of the information at issue is further evidenced by the nature of such information, and Li's efforts to obtain it.  Again, this information includes, among other things, roadmaps, sketches and source code for Tesla's Optimus hand technology—information which reveals *how* the technology works currently, and how it will be further developed.  Liang Decl. ¶ 6; Pinto Decl. ¶ 5.  That is precisely the type of information that courts in this Circuit find to be sufficient to constitute trade secrets.  *See, e.g., E. W. Bank v. Shanker*, 2021 WL 3112452, at *9 (N.D. Cal. July 22, 2021) (roadmaps related to confidential technology); *WeRide*, 379 F. Supp. 3d at 847 (source code); *Forro Precision, Inc. v. Int'l Bus. Machines*, 673 F.2d 1045, 1057 (9th Cir. 1982) (engineering drawings and blueprints).  That Li repeatedly accessed dozens of documents reflecting this information over the last two months of his employment at Tesla— including a 353-page PowerPoint related to hand sensing, which he accessed *over 65 times*— further underscores its value.  Liang Decl., Ex. A at Tab K.

***Tesla's Considerable Efforts to Maintain Secrecy of its Trade Secrets.***  The second prong of the trade secrets definition is also satisfied, as Tesla has worked hard to safeguard the

confidentiality of its trade secrets through rigorous security systems and procedures. *See supra* §§ II.2; IV.1.A.1. For the physical facilities, Tesla limits access to only authorized personnel (even within Tesla) and enforces this policy through use of a badging system and through constant monitoring by cameras and security guards. Liang Decl. ¶ 9. Visitors are required to check in with a receptionist or security guard, sign a nondisclosure agreement, and be escorted by a Tesla employee; and they are photographed. *Id.* Separately, Tesla's network and servers are password-protected, firewall-protected, and accessible only to current Tesla employees with proper (unique) and, in some cases, restricted credentials. *Id.* ¶ 10. To access the network, employees must also satisfy a two-factor authentication process. *Id.* In addition, Tesla guards its network with a team of security systems engineers that have designed and implemented intrusion detection systems, security video systems, and access control systems. *Id.* ¶ 11. Moreover, Tesla restricts access to proprietary and confidential information—including information related to the Optimus project—so that it is accessible only to those with a demonstrated need. *Id.* ¶ 12; Pinto Decl. ¶ 3. Those employees, in turn, are bound to strict confidentiality and non-disclosure agreements. Ahearn Decl. ¶ 5. In addition to the Tesla-wide security protocols described above (and *supra* § II.2), Tesla's Optimus team also (1) occupies lab spaces that are restricted to employees only with a demonstrated need for access, and (2) receive reminders from Tesla's information security team about its obligations to protect Tesla's intellectual property and the ramifications for failing to adhere to Tesla's information security and confidentiality policies. Liang Decl. ¶ 13; Exs. D, E.

These security measures, which protect the Optimus trade secrets, are more than sufficient to satisfy the second prong of the "trade secret" definition—as courts have found in analyzing analogous measures. *See*, *e.g.*, *WeRide*, 379 F. Supp. 3d at 847 (restricting access to on-site employees and off-site employees using a VPN, requiring unique log-in credentials to decrypt the source code, and requiring employees to sign confidentiality agreement); *Beluca*, 660 F. Supp. 3d at 909 (limiting access for company "employees to a 'need-to-know' basis and requiring third-party consultants to agree to maintain the confidentiality of its trade secrets"); *Acrisure of California, LLC v. Comfort Ins. Servs., LLC*, 2020 WL 8575185, at *2 (S.D. Cal.

Nov. 24, 2020) (finding plaintiff's protective measures adequate due to "password protecting its computers, network, and other databases; restricting access to certain databases or information so that only those personnel who require the information can access it; and requiring employees to sign employment agreements which contain confidentiality clauses" (internal quotation marks omitted)); *see also MBS Eng'g Inc. v. Black Hemp Box, LLC*, 2021 WL 2458370, at *2 (N.D. Cal. June 16, 2021) (rejecting argument that the plaintiff did not plausibly allege reasonable secrecy measures given that company required employees to sign NDA).

### 2.    Li Misappropriated, and Defendants Present a Continuing Threat of Misappropriation of, Tesla's Trade Secrets

Li's theft and any subsequent use of Tesla's trade secrets to build a competing product is textbook "misappropriation."    Under both state and federal statutes, the term "misappropriation" includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."    18 U.S.C. § 1839(5)(A); Cal. Civ. Code § 3426.1(b)(1).  It also includes the "disclosure or use of a trade secret of another without express or implied consent by a person who" either "used improper means to acquire knowledge of the trade secret" or "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret" was taken through "improper means" or circumstances giving rise to a duty of secrecy.    18 U.S.C. § 1839(5)(B); Cal. Civ. Code § 3426.1(b)(2).    Both statutes define "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."    18 U.S.C. § 1839(6)(A); Cal. Civ. Code § 3426.1(a). Recognizing that "direct evidence of misappropriation is rare," *Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1075 (N.D. Cal. 2021), courts have noted that "[c]ircumstantial evidence is particularly appropriate in trade secrets cases," *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007).

*Li Accessed and Took Files He Had No Legitimate Tesla Use For*.  Li held a position at Tesla that provided him access to Optimus-related trade secrets, including those related to robotic hand technology.  Ahearn Decl. ¶ 4; Liang Decl. ¶ 6.  Due to the sensitive nature of this

information, Tesla required Li to sign agreements that bound him to keep such secrets confidential.  Ahearn Decl. ¶¶ 5–6.  While Li worked on Optimus-related projects for his full tenure at Tesla, his responsibilities regarding the Optimus hands ceased when he was reassigned to the chest computer team on July 1, 2024.  Pinto Decl. ¶ 5.  After that time, Li had no legitimate, Tesla-related reason to access or download information related to Optimus hands—i.e., the trade secrets at issue.  *Id.*; Liang Decl. ¶ 6.  Li knew that such files (like all other Tesla business information) were only to be accessed on a "need-to-know" basis (Ahearn Decl., Ex. D at 6), and since they were no longer within the scope of his responsibilities, he should not have accessed them, even if they were in an Optimus folder to which he previously was granted access in the scope of his (former) duties.

But that did not stop Li.  In the months preceding his departure from the company on September 13, 2024—*including up until 8 PM on his last day*—Li repeatedly accessed and downloaded files related to the Optimus hand.  Liang Decl. ¶ 6; Ahearn Decl. ¶ 9; *see also supra* § II.3.  Li clearly "knew or had reason to know that downloading and removing [these trade secrets] was theft or, at minimum, a breach of [his] contractual duty to maintain secrecy."  *Comet Techs.*, 2018 WL 1990226, at *4.

*Indeed, at the same time that Li was repeatedly accessing and downloading these confidential modeling studies, test results, close-range videos, benchmarks, specifications, source code, performance targets, equations, and sketches (mid-July-to-September), Li also conducted voluminous online searches from his Tesla desktop computer about venture capital funding and startup resources*.  Liang Decl. ¶ 7.  This activity would be suspicious for any employee in his final months of employment; but that conduct poses an imminent threat where, as here, the employee immediately starts a competing company—offering the same technology at lightning speed—less than a week after his departure.  *See* Kaounis Decl., Ex. M.  Li's decision to access and download confidential information "before leaving [his] employment to work at a competitor" is a classic case of misappropriation.  *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016); *see also Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d

1198, 1207-1208 (E.D. Cal. 2020) (employee's copying of files at the time of departure strongly suggests intent to use the information in their new employment).

     ***Tesla is Likely to Show that Proception Improperly Acquired and Used Tesla's Optimus Information***. Tesla will show that Proception knew or should have known that it was using Tesla's Optimus trade secrets. Li co-founded Proception in September 2024. *See* Kaounis Decl., Ex. M. Li—also Proception's CEO—knew or should have known that the files he accessed and downloaded from Tesla's Optimus Gen4 *Forearm* FT Sensing SharePoint and Tesla's *Hand Sensing* SharePoint were not within the scope of his Optimus Chest Computer work at the time (Pinto Decl. ¶ 5(b) & 5(i)). Roughly five months after Proception was founded, it touted that it had "successfully built" its "first functional prototype" of "advanced humanoid robotic hands." Ahearn Decl. ¶ 8. In Proception's own words, reaching this milestone "in just 4 months" was "incredible." *Id.* On top of this, Proception promised the market it would be shipping the hand to research customers in the coming months—in direct competition with Tesla. *Id.* Proception thus claimed to have created robotic hand technology (from scratch) in four months (*id*.) with only a handful of employees (Kaounis Decl. Ex. B (Proception.ai/careers)), when it took a highly skilled and well-financed team at Tesla multiple years to do the same.

     As courts in this District have explained, "[t]he implausibly fast development of technology can contribute to finding misappropriation." *WeRide*, 379 F. Supp. 3d at 849. That the robotic hand "developed" by Proception is strikingly similar to what Li worked on at Tesla, (Pinto Decl. ¶ 6), offers only further support for a finding of misappropriation. *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 883 (N.D. Cal. 2018) ("[A]llegations of similarities [are] sufficient when accompanied by allegations of exactly how defendants improperly obtained the alleged trade secrets.").

     At a minimum, Proception cannot claim to be the innocent recipient of these stolen secrets, as Li (who took the information) founded the company and, as CEO, holds a "senior role." *WeRide*, 379 F. Supp. 3d at 850; *see also Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) (explaining that employer may be liable

"under the doctrine of respondent superior" where its employee's "misappropriation was foreseeable"). The only logical conclusion to draw is that Proception developed its prototype using Tesla's Optimus research and development information. Accordingly, Tesla is likely to prove that Optimus trade secrets have been both disclosed and used.

   ***Li and Proception Present an Imminent Threat of Use and Disclosure of Tesla's Optimus Information***. Even more alarming, Proception has signaled that it will use and disclose Tesla's confidential information in the near future. Proception has already publicized its prototype and gifted models of it to numerous third parties.[4] *See* Ahearn Decl., Exs. G, H. Tesla is likely to show that Proception is continuing to build on the information Li stole to refine its prototype, as it recently announced that "in the coming 9 months," it would make its "first shipments" of "advanced humanoid hands" "to research customers." Ahearn Decl. ¶ 8. In other words, Proception not only *intends* to disseminate Tesla's trade secrets, but it has *already* put those plans into motion. These shipments of product to research customers—who are expected to generate "validation" and "feedback" (Ahearn Decl., Ex. I at PDF p. 3)—will further disseminate and endanger any Tesla information already incorporated into the Proception hands. For this reason, Tesla's reasonable request to halt such shipments and dissemination of Tesla confidential information without prior order of this Court should be granted.

   ***Li and Proception Declined to Cooperate with Tesla***. Finally, Li and Proception have refused to provide reasonable assurances that they are not using Tesla's confidential information. Ahearn Decl. ¶ 12(c); Kaounis Decl. ¶¶ 15–17 & Ex. Q. Continued misuse and improper disclosure is therefore an ongoing threat—as Proception likely hones its product with Tesla trade secrets and then disseminates that product for analysis. *See Power Integrations, Inc. v. De Lara*, 2020 WL 1467406, at *19 (S.D. Cal. Mar. 26, 2020) ("Threatened misappropriation may occur" when a defendant "actually has misused or disclosed" the plaintiff's "trade secrets in the past," "intends to improperly use or disclose some of those trade secrets," and "wrongly refuses to return the trade secrets.").

---

[4] By contrast, Tesla only discloses select pieces of confidential hand-related information to individual third-party vendors on a need-to-know basis subject to strict NDAs. Pinto Decl. ¶ 6.

Gibson, Dunn & Crutcher LLP

### B.    Tesla Is Likely To Succeed On Its Tortious Interference Claim

Tesla is likely to succeed in showing that Proception's involvement in the scheme to deprive Tesla of its confidential information renders it liable for tortious interference with Li's NDA as well.  "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)).  "To establish the claim, the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action."  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (Cal. 2004).  Tesla is likely to establish each of these elements.

*First*, Li entered into various confidentiality agreements when he first joined Tesla, including an NDA.  Ahearn Decl. ¶¶ 5–6.  By entering into this NDA, Li agreed to not disclose Tesla's "Proprietary Information," defined as "all information, in any form and format, to which I have access by virtue of and in the course of my employment."  *Id.* ¶ 5.  The information covered by this agreement also included:

> non-public technical data, trade secrets, know-how, research and development, strategies, product launches, intellectual property, information about products or services, markets, features, technology, concepts, ideas, plans, designs, formulas, methods, processes, discoveries, improvements, source and object codes, data, programs, lists of or information relating to suppliers or customers, non-public financial information, Inventions, engineering, hardware configuration, marketing, and other business information of the Company that I have access to either directly or indirectly, in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Company property.

Ahearn Decl., Ex. B § 1.1.  Li further agreed to "hold in strictest confidence," and "not disclose, use, or publish," any of Tesla's Proprietary Information without express written authorization. *Id.* at § 1.

Gibson, Dunn &
Crutcher LLP

*Second*, Proception knew about Li's NDA, as it was entered into by its founder and CEO, whose "knowledge is imputed to [the company]." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1037 n.3 (9th Cir. 2016). *Third*, Tesla will show Proception intentionally induced Li into breaching the agreement in order "to gain a competitive advantage [and] to gain access to the confidential information." *whiteCryption Corp. v. Arxan Techs., Inc.*, 2016 WL 3275944, at *5 (N.D. Cal. June 15, 2016). Tesla will show that Proception then used the stolen information—i.e., the fruit of the breach—to short-circuit the normal R&D process and create a competing product in a fraction of the time that it would have taken absent the breach. *Fourth*, Tesla will prove that Proception successfully induced Li to breach the NDA by improper disclosure and use of Tesla's confidential information, in violation of his agreements. *See supra* § II.2. *Fifth*, Tesla has suffered and will continue to suffer irreparable harm as a result of Li's breach of those agreements. *See infra* at IV.2.

Tesla will succeed in showing that Proception intentionally interfered with Li's obligation to maintain the secrecy of Tesla's information, and that Li did so by disclosing and using the information to Tesla's detriment.

## 2.    Tesla Has Suffered And Will Continue To Suffer Irreparable Harm Without An Injunction.

Irreparable harm from the theft of Tesla's trade secrets is manifest and, indeed, is presumed as a matter of law. Courts "in this district have presumed that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated." *Invisible Narratives v. Next Level Apps Tech. - FZCO*, 2025 WL 551866, at *3 (N.D. Cal. Feb. 19, 2025) (quoting *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018)); *see also W. Directories, Inc. v. Golden Guide Directors, Inc.*, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009) (same). Accordingly, if the Court concludes that Tesla is likely to prevail on its trade secret misappropriation claim (as it should), such a conclusion would also support a finding of irreparable harm. *See Comet Techs.*, 2018 WL 1990226, at *5.

If the Court were to look beyond this presumption (which it need not do), the irreparable harm is evident. *First*, the threatened loss of secrecy within Proception is irreparable harm. As

shown above (*supra* § IV.2), the secrets have been taken by a founder and CEO of a company that can make competitive use of them, and the secrets' value has been jeopardized. *See, e.g., SolarPark Korea Co. v. Solaria Corp.*, 2023 WL 4983159, at *8 (N.D. Cal. Aug. 2, 2023) (explaining that "[m]onetary damages would not suffice" where plaintiff's "trade secrets are disclosed to companies with no experience with the [relevant] technology," such that disclosure will cause plaintiff to "lose its competitive edge"); *see also Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (injunction may be necessary "to protect the secrecy of misappropriated information"). Where a former employee has absconded with files to his new employer—even if those files never crossed into the employer's electronic systems, "[i]t is far better to … put in prophylactic measures … to prevent misappropriation (or further misappropriation)" than to try and "enjoin parts of defendants' technology that use [Plaintiffs'] trade secrets" after trial. *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (2017).

*Second*, the threat of future disclosure to third parties is also irreparable harm. *Cf. Waymo*, 2017 WL 2123560, at *11 ("any Waymo trade secret used in defendants' technology may be destroyed via disclosure" to regulatory bodies). Proception's announcements have made clear that its existing protype and planned research collaborations are likely to disclose Tesla's Optimus trade secrets. Ahearn Decl., Ex. I at PDF p. 3. "[T]he loss of trade secrets cannot be measured in money damages where that secret, once lost, is lost forever, and thus irreparable harm is likely shown where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience." *Genentech, Inc. v. JHL Biotech, Inc.*, 2019 WL 1045911, at *19 (N.D. Cal. Mar. 5, 2019) (internal quotation marks omitted). Without immediate injunctive relief to prevent any dissemination of Tesla's trade secrets and expedited discovery to investigate the scope of such harm (as requested by the concurrently filed motion), the secrets could be irretrievably lost. *See id.* (finding irreparable harm).

*Third*, Li's and Proception's use of Tesla's trade secrets has already permitted Proception to shave time off the standard independent development timeline for robotic hand technology, netting Proception an unjust head start which it can build upon to Tesla's detriment. Pinto Decl. ¶ 5. Proception must not be permitted to use Tesla's trade secrets to further shortcut the

development process, hasten its market entry, unfairly compete, and make progress on any competing inventions in the field of robotics. *See supra* § IV.1.A.2. Courts in this Circuit repeatedly have held that "a defendant's ability to gain a competitive advantage through the use of confidential information to develop a competing product is sufficient to constitute irreparable harm." *Fujikura Composite Am., Inc. v. Dee*, 2024 WL 3261214, at *5 (S.D. Cal. June 28, 2024) (quoting *SolarPark*, 2023 WL 4983159, at *8); *see Netlist Inc. v. Diablo Techs. Inc.*, 2015 WL 153724, at *7 (N.D. Cal. Jan. 12, 2015). Again, this is because after trial, "it may prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred." *Waymo*, 2017 WL 2123560, at *11.[5]

Finally, Li and Proception have refused to provide reasonable assurances that they are not using Tesla's confidential information. Ahearn Decl., ¶ 12(c); Kaounis Decl. ¶¶ 15–17 & Ex. Q. Where Defendants have threatened further misappropriation, *see supra* § IV.1.A.2, such conduct only heightens the urgency and the need to maintain the status quo. *See, e.g.*, *Gallagher Benefits Servs., Inc. v. De La Torre*, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007) ("In general, the imminent use of a trade secret constitutes irreparable harm."), *aff'd in relevant part*, 283 F. App'x 543 (9th Cir. 2008). In short, "[i]t would likely be futile to attempt, after the fact, to estimate the monetary value of injury suffered from either the loss of [Tesla's] competitive position in this nascent industry or the destruction [by loss of secrecy] of its trade secrets pertaining to the same. Monetary damages would thus be unavailable to compensate for the irreparable harm threatened here" (*Waymo*, 2017 WL 2123560, at *11) and an injunction should be granted.

### 3. The Balance Of Equities And Public Interest Favor An Injunction

The balance of equities favors issuing a preliminary injunction because Tesla's proposed injunction "would do no more than require Defendant to comply with federal and state laws." *Henry Schein*, 191 F. Supp. 3d at 1077 (internal quotation marks omitted). There is no legitimate hardship Defendants would suffer by being ordered to do what they should have already done:

---

[5] Further, any momentum Proception gains "would improve [its] ability to attract … talented engineers away from competitors"—including Tesla. *Waymo*, 2017 WL 2123560, at *11.

return Tesla's trade secret and confidential information, confirm that it has been deleted from its Defendants' repositories (with a proper forensic copy) and not disclosed to any third parties, and provide Tesla the means to verify the same, along with reasonable prevention of any imminent disclosure by not shipping any robotic hand or disseminating any confidential Tesla information without prior order of this Court. Enforcing existing trade secret law, and other contractual obligations, through an injunction prohibiting Defendants from using Tesla's trade secrets and confidential information, "merely requires [Defendants] to comply with [their] existing obligations." *SolarPark Korea*, 2023 WL 4983159, at *9. And because Defendants already have publicly stated that shipments of their product would be within nine months of March 2025 (Ahearn Decl. ¶ 8 & Ex. F at 3) there is no threat of competitive harm to their business in halting those shipments without prior Court order. If it turns out that no trade secrets have been misused or disclosed by Defendants, then the injunction will serve as no more than a minor inconvenience to their ongoing business (i.e., the inconvenience of allowing Tesla to confirm no foul play), which pales in comparison to the serious and irreparable harm that will befall Tesla if its hard-earned trade secrets continue to be used unabated by a competitor. *See supra* § IV.2.

The public interest also supports an injunction here. "It is well-established that courts often find that the public has a strong interest in protecting intellectual property rights and in this case, an injunction would also promote fair and lawful competition in an emerging market." *Shanker*, 2021 WL 3112452, at *14 (internal quotation marks omitted) (alterations adopted); *see also Waymo*, 2017 WL 2123560, at *11 (explaining that the public is served by "vindicating intellectual property rights, and in prohibiting unfair competition"). Indeed, "Congress and California's legislature, by passing trade secret legislation, have indicated that the public interest favors the issuance of injunctions that prevent continued misuse of trade secrets." *Fujikura Composite*, 2024 WL 3261214, at *15.

## 4.    The Court Should Not Set A Bond

Even though Rule 65 permits the Court to set a bond requirement before a preliminary injunction goes into effect, a bond would not be appropriate in this case. Courts in this District, as well as the Ninth Circuit, have recognized that no bond is necessary to "simply enjoin [the]

Defendant from doing something [the] Defendant never had a right to do in the first place." *Comet Techs.*, 2018 WL 1990226, at *6; *see also Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."). Here, Defendants never had any right to use, access, transmit, or exploit Tesla's trade secrets, but Tesla is likely to prove that they have done so.  Tesla should not be required to pay a fee to stop Defendants from continuing any wrongdoing—which (aside from turning over certain data, to confirm the extent of any wrongdoing) is all the preliminary injunction would do.  On the off chance that there is no wrongdoing, Defendants would hardly be the worse off as they would be permitted to continue use of their independently-sourced information and continue running their business.  No bond is needed here at this stage.

Should expedited discovery show that Defendants' product shipments must be halted longer-term, Tesla can and will provide a bond at that time.

**5.    Expedited Discovery**

In addition to granting a preliminary injunction, the Court should grant Tesla leave to take expedited discovery under Federal Rule of Civil Procedure 26(d)(1), as requested by, and explained in, Tesla's concurrently filed motion for expedited discovery.  "District courts in the Ninth Circuit regularly permit expedited discovery in cases that," like this one, "implicate claims of improper use of confidential information or trade secrets."  *Citibank, N.A. v. Mitchell*, 2024 WL 4906076, at *6 (N.D. Cal. Nov. 26, 2024) (collecting cases).

**V.    CONCLUSION**

For the foregoing reasons, Tesla respectfully requests that the Court grant Tesla's motion for Preliminary Injunction.

1   DATED: June 16, 2025                Respectfully submitted,

2                                       GIBSON, DUNN & CRUTCHER LLP

3

4                                        By: */s/* Josh Krevitt
5                                       Josh Krevitt, Bar No. 208552
                                          JKrevitt@gibsondunn.com
6                                       310 University Avenue
                                        Palo Alto, CA  94301-1744
                                        Telephone: 650.849.5300
7
                                        Orin Snyder (admitted *pro hac vice*)
8                                         OSnyder@gibsondunn.com
                                        200 Park Avenue
9                                       New York, NY  10166-0193
                                        Telephone: 212.351.4000
10
                                        Angelique Kaounis, Bar No. 209833
11                                        AKaounis@gibsondunn.com
                                        2000 Avenue of the Stars, Suite 1200N
12                                      Los Angeles, CA  90067-4700
                                        Telephone: 310.552.8500
13
                                        *Attorneys for Plaintiff*
14                                      TESLA, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFF TESLA, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND
EXPEDITED DISCOVERY