GIBSON, DUNN & CRUTCHER LLP
JOSH KREVITT, SBN 208552
   jkrevitt@gibsondunn.com
310 University Avenue
Palo Alto, California 94301-1744
Telephone: 650.849.5300
Facsimile: 650.849.5333

ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
2000 Avenue of the Stars, Suite 1200N
Los Angeles, California 90067-4700
Telephone: 310.552.8500
Facsimile: 310.551.8741

ORIN SNYDER (admitted *pro hac vice*)
   osnyder@gibsondunn.com
JEREMY BUNTING (admitted *pro hac vice*)
   jbunting@gibsondunn.com
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Plaintiff*
TESLA, INC.

TESLA, INC.
TERRY W. AHEARN, SBN 216543
   tahearn@tesla.com
A. LOUIS DORNY, SBN 212054
   ldorny@tesla.com
KRISTA M. CARTER, SBN 225229
   kricarter@tesla.com
3000 Hanover Street
Palo Alto, California 94304
Telephone: 408.204.7384

*Attorneys for Plaintiff*
TESLA, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| TESLA, INC., a Texas Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>PROCEPTION, INC., a Delaware Corporation, and ZHONGJIE "JAY" LI, an individual,<br><br>    Defendants. | CASE NO. 5:25-cv-04963-SVK<br><br>**PLAINTIFF TESLA, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Hearing:**<br>Date:    October 22, 2025<br>Time:   10:00 AM<br>Place:  San Jose Courthouse, Courtroom 6<br>          280 South 1st Street, San Jose, CA 95113<br><br>Hon. Susan van Keulen |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT .........................................................................................................................3

    I.        The Opposition does not deny Defendants used Tesla confidential information or claim Defendants will not use Tesla confidential information in the future ..................................3

    II.       Tesla has sufficiently identified the trade secrets Defendants misappropriated. .......4

    III.      Tesla is likely to succeed on the merits ......................................................................4

        A.        Li misappropriated Tesla's confidential information and trade secrets. ................4

        B.        The Proception hand's implausible development demonstrates Defendants' misappropriation of Tesla's trade secrets. ..........................................................10

        C.        Tesla is likely to succeed on its interference claim. ............................................12

    IV.     Tesla has suffered and will continue to suffer irreparable harm absent an injunction. 12

    V.      The balance of the equities and public interest weigh in favor of injunctive relief. 14

    VI.     No bond should be necessary to enjoin unlawful conduct. ......................................15

CONCLUSION ....................................................................................................................15

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*7EDU Impact Acad. Inc. v. You*,
   760 F. Supp. 3d 981 (N.D. Cal. 2024) ................................................................................ 4, 13

*Apple Inc. v. Rivos, Inc.*,
   2023 WL 5183034 (N.D. Cal. Aug. 11, 2023) ............................................................................ 5

*AT&T Commc'ns of Cal. v. Pacific Bell*,
   1996 WL 940836 (N.D. Cal. July 3, 1996) .............................................................................. 13

*Bambu Franchising, LLC v. Nguyen*,
   537 F. Supp. 3d 1066 (N.D. Cal. 2021) ....................................................................................... 4

*Beluca Ventures LLC v. Einride Aktiebolag*,
   660 F. Supp. 3d 898 (N.D. Cal. 2023) ......................................................................................... 4

*Carl Zeiss Meditec, Inc. v. Topcon Med. Sys.*,
   2021 WL 1186335 (N.D. Cal. Mar. 1, 2021) ................................................................. 5, 14, 15

*Comet Techs. United States of Am., Inc. v. Beuerman*,
   2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ......................................................................... 15

*Dolman v. Agree*,
   157 F.3d 708 (9th Cir. 1998) ....................................................................................................... 6

*Fujikura Ltd. v. Yang*,
   2024 WL 3261214 (N.D. Cal. July 2, 2024) ............................................................................ 14

*Lydo Enters. v. City of Las Vegas*,
   745 F.2d 1211 (9th Cir. 1984) ................................................................................................... 14

*Metricolor, LLC v. L'Oreal USA, Inc.*,
   2022 WL 17072006 (C.D. Cal. Nov. 16, 2022) ......................................................................... 5

*Norsat Intern., Inc. v. B.I.P. Corp.*,
   2013 WL 5530771 (S.D. Cal. Oct. 3, 2013) ............................................................................. 14

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 .......................................................................................................................... 14

*Power Integrations, Inc. v. De Lara*,
   2020 WL 1467406 (S.D. Cal. Mar. 26, 2020) ......................................................................... 13

*Shippers, a Division of Illinois Tool Works, Inc. v. Fontenot*,
    2013 WL 12092056 (S.D. Cal. Sept. 23, 2013) ......................................................................... 8

*SkinMedica, Inc. v. Histogen Inc.*,
    869 F. Supp. 2d 1176 (S.D. Cal. 2012) ................................................................................ 12

*Speech Tech. Assocs. v. Adaptive Commc'n Sys.*,
    1994 WL 449032 (N.D. Cal. Aug. 16, 1994) ....................................................................... 12

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 2123560 (N.D. Cal. May 15, 2017) ........................................................... 13, 14, 15

*Wisk Aero LLC v. Archer Aviation Inc.*,
    2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) .............................................................. 13, 15

## INTRODUCTION

Tesla has established a clear likelihood of success on the merits of its claim that Defendants misappropriated its trade secrets and used them to jump-start a competing business. The record is unambiguous and essentially unrebutted. While still a Tesla employee, Li repeatedly and improperly accessed highly confidential Optimus robot hand-related files far outside the scope of his role; he simultaneously searched for investors and planned a rival robotics company; and, within just months of resigning, he unveiled a competing robotic hand that could only have been built with Tesla's stolen information.

Incredibly, in their opposition papers, Defendants do not even deny that they improperly accessed and used Tesla's trade secrets. Tesla accused Defendants of using its technology to build their hand. Yet, nowhere in the Opposition and nowhere in Li's sworn declaration do Defendants even once say they did not do that. And nowhere in any sworn declaration does any witness ever say that Defendants did not use Tesla confidential information to build this hand. Defendants' failure even to deny that they have used—and that Li still has—Tesla's trade secrets is a stunning omission and alone necessitates the proportionate relief Tesla has requested.

Defendants' refusal to consent to that proportionate relief—which would simply require Defendants not to use Tesla's confidential information—is similarly shocking and revealing. Tesla asked Defendants a simple and direct question: will Defendants agree not to use or disclose Tesla confidential information? Dkt. 64-5. That should have elicited an equally direct response: no. But instead, Defendants refused to make that basic undertaking. Kaounis Decl. Ex. A. That is why injunctive relief is not only warranted, but essential.

Apparently incapable of denying misuse, Defendants' Opposition tries to re-characterize systematic misconduct as "merely accessing or downloading documents" and to excuse their spurious product as an "early prototype." *See, e.g.*, Dkt. 71-2, Opposition Brief ("Opp.") 2:8, 10:18, 22:8, 29:3, 29:7 ("mere possession"); 22:7 ("merely accessing or downloading"); 22:20 ("merely downloading"); 26:17 ("similarity, without more"). Defendants' efforts to minimize their wrongdoing fail because the record establishes that Li improperly accessed and Defendants apparently used—and will continue to use—Tesla's trade secrets, warranting injunctive relief.

Defendants also try to excuse Li's repeated, improper access to sensitive out of scope files by claiming that he was "collaborating" with colleagues. The truth is, Tesla removed Li from the Optimus hand project and even if he occasionally shared insights with a colleague, that does not remotely justify hundreds of improper access events to confidential files, coupled with repeated use of a desktop snipping/screenshot tool in the final days of his employment.

The relief Tesla seeks on this motion is exceedingly proportionate and narrow: an order directing Defendants not to use or disclose Tesla confidential information and not to destroy evidence. Tesla also asks that they not ship their infringing product absent an order of the Court. The imminent and irreparable harm Tesla faces more than justifies this circumscribed relief. Proception intends to release its hand to third parties in the coming months, which could immediately expose Tesla's trade secrets and confidential information and irreparably destroy their value. Any harm Defendants might face from a temporary delay is entirely self-inflicted—a consequence of their conscious decision to build a product using someone else's information.

Tesla respectfully requests that the Court grant its preliminary injunction motion.

## STATEMENT OF FACTS

Tesla has invested billions of dollars and years of engineering work into developing its humanoid robot, Optimus. Among its components, the hand has proven the most difficult and resource-intensive to design.[1] None of the actuators in Optimus can be purchased from suppliers; Tesla has had to design every motor, gear box, and controller "from scratch."[2]

Defendant Li joined Tesla in 2022 on the Optimus sensor team, initially contributing to hand development. Dkt. 14-19 (Ahearn Decl.) ¶ 4. On July 1, 2024, he was reassigned to the chest computer team after he disagreed with the direction of the hand technology. Dkt. 71-3 (Li Decl.) ¶ 14. Despite his reassignment, the extensive evidence Tesla submitted for this Motion, and expedited discovery, confirmed that Li repeatedly accessed Optimus hand files through his last day on September 13, 2024.

---

[1] *All-In Podcast, Elon Musk on DOGE, Optimus, Starlink Smartphones, Evolving with AI, ...* YouTube (Sept. 10, 2025), https://www.youtube.com/watch?v=qeZqZBRA-6Q ("9/9/25 *All-In Podcast*").
[2] *Id.*

Li co-founded Proception only weeks later, making its first hire in October 2024, Dkt. 71-3 ¶ 43. By March 2025—barely five months later—Proception announced that it had successfully built advanced humanoid robot hands, on an impossibly short timeline for a small startup with no prior track record. *See* Dkt. 71-3 ¶ 46. By contrast, developing the necessary actuators and solving the other complexities of robotic hand development have required Tesla to devote years of trial-and-error and vast resources. *See* Dkt. 14-7 at PDF p. 5; Dkt. 14-8 at PDF p. 4.

## ARGUMENT

**I.   The Opposition does not deny Defendants used Tesla confidential information or claim Defendants will not use Tesla confidential information in the future.**

The proportionate relief Tesla seeks—merely requiring Defendants not to use Tesla's confidential material—is necessary given that nowhere in Defendants' 33-page Opposition or supporting Declarations do Defendants even once deny they already have used Tesla's confidential information. And nowhere in their papers do Defendants claim they will not use Tesla confidential information in the future. These glaring omissions are virtually unprecedented in the context of a preliminary injunction opposition. In light of them, it is difficult to conceive of a situation in which injunctive relief is more warranted to preserve the status quo.

Defendants do not seriously contest that Li accessed the files in his activity logs, instead claiming he was "collaborating" with people on other teams. *See infra* III.A.2. But Tesla is simply asking Defendants to not use or disclose those documents going forward. Tesla asked Defendants not to use or disclose its confidential information before it filed this action. S*ee* Dkt. 14-19 ¶¶ 9–12. Defendants refused. *Id.* Tesla asked *again* after expedited discovery. Kaounis Decl. Ex. A. Yet again, Defendants refused. *Id.* Even assuming that each of Li's hundreds of access events to out of scope documents were proper, Defendants could still say they have not, and will not, use those documents or disclose them. But Defendants will not agree to these very simple, extraordinarily narrow assurances. Therefore, Tesla respectfully requests that the Court direct Defendants not to use its confidential information or disclose that same information by shipping its infringing product into the open market until a further Order of the Court subsequent to additional fact-finding.

**II.      Tesla has sufficiently identified the trade secrets Defendants misappropriated.**

The most critical issues of fact in this action are first, whether Defendants used Tesla's confidential information, and second, whether they will do so in the future. Defendants try to avoid engaging with these issues by arguing that "Tesla seeks an order enjoining the misappropriation of 'confidential and trade secret information' without defining what that information is." Opp. at 14. That is false. Tesla identified the specific documents—by *file name*—that Defendants misappropriated, Dkt. 44-4, and then explained that these documents fall into eight detailed categories as containing highly sensitive Optimus project (1) engineering specifications, schematics, and blueprints, including measurements, grips, tensions, ranges of motion, degrees of freedom, (2) tests, their results, and technical analyses, (3) models, (4) product roadmaps, (5) close-range video profiles of prototypes, (6) strategy documents, (7) vendor research, and (8) source code related to Optimus's hand motion and actuators. Dkt. 1 ¶ 4; Dkt. 17-4 ¶ 5. That is all that is required. *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023) (identifying "categories of information" is sufficient "where the complaint alleges that these categories … are contained within specific documents"). This is consistent with the Court's acknowledgment at the July 8, 2025 hearing on Tesla's expedited discovery motion that, "the Liang [] declaration, with the Pinto [declaration] specifically as well in paragraph five . . . specifically identifies the parameters of what we're searching for because it identifies the specific files that were accessed [] and were downloaded." Dkt. 55, Tr. 30:20–31:12.

**III.     Tesla is likely to succeed on the merits.**

      **A. Li misappropriated Tesla's confidential information and trade secrets.**

          **1.   Li improperly accessed Tesla information on hundreds of occasions.**

While "direct evidence of misappropriation is rare," *Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1075 (N.D. Cal. 2021), Tesla has provided uncontested evidence that on *hundreds* of occasions after his removal from the hand team—and while he was planning his competitive company—Li accessed, and in some cases downloaded, highly sensitive material. This included photos, videos, diagrams, testing, data, calculations, research, benchmarks, and more, all depicting or relating to its humanoid hand—the most complex component of the Optimus robot. *See 7EDU Impact*

*Acad. Inc. v. You*, 760 F. Supp. 3d 981, 997 (N.D. Cal. 2024) (evidence that Defendant "opened nearly 100 files from 7EDU's Google Drive days prior to her departure" supported finding of misappropriation). During his last week at Tesla, Li also repeatedly opened a "snipping" tool on his computer. Ahearn Decl. Ex. C. After Li left, with this information in hand, he started his competing business in record time. Dkt. 71-3 (Li Decl.) ¶ 43.

These facts are essentially unrebutted, and lead to the inescapable conclusion that "it is more probable than not that what plaintiffs allege happened did in fact take place"—i.e., Li misappropriated Tesla's hand-related information. *Carl Zeiss Meditec, Inc. v. Topcon Med. Sys.*, 2021 WL 1186335, at *6 (N.D. Cal. Mar. 1, 2021), *vacated in part on other grounds*, 2022 WL 1530491 (N.D. Cal. May 16, 2022); *see also Metricolor, LLC v. L'Oreal USA, Inc.*, 2022 WL 17072006, at *10 (C.D. Cal. Nov. 16, 2022) ("The law permits the trier of fact to find trade secret misappropriation based on circumstantial evidence as part of the totality of the circumstances.").

In fact, "the sheer quantity and content of data" improperly accessed by Li "in the immediate days before [his] departure, in conjunction with the substantially similar roles and technology [he is] working with at [Proception], readily lend themselves to an inference that these defendants have used or are using [Tesla] confidential information." *Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034, at *6 (N.D. Cal. Aug. 11, 2023);[3] *see also Carl Zeiss*, 2021 WL 1186335, at *6, *8 (granting preliminary injunction and noting that the "timing of [defendants'] actions 'strongly suggests they intended to use the information in their employment with [their new company]).'"

Unable to challenge this expansive evidence, Defendants misleadingly focus their discussion almost exclusively on explaining Li's retention of the files in his document production in response to limited expedited discovery. In so doing, Defendants ignore the *hundreds* of inappropriate access events submitted in support of Tesla's Motion. *See* Dkts. 17-5 & 44-4 (Liang Ex. A); Dkt. 14, Tesla's Opening Brief ("Op. Br.") at 6–8. Tesla identified scores of development-related files that contain its valuable confidential information that Li accessed and that a competitor could (and here, apparently

---

[3] This passage in *Rivos* referred to exfiltration, and not access, but the core principle—that the totality of conduct must be evaluated—applies with equal force here.

5

did) use to gain an unfair competitive advantage. Dkt. 17-4. Li does not explain his access to these files—apart from dismissively saying that two were his "personal sandboxes," which Li compiled and then repeatedly referred to even after his transfer to the chest computer team. Dkt. 71-3 ¶ 35 (referring to documents in Dkt. 44-4, Tabs F & K). It is a remarkable concession that Li compiled sensitive Optimus hand information, *see* Dkt. 17-4 ¶ 5(e) (Pinto Decl.) (discussing "███████████████████████████" file), into two "personal sandbox" files that he accessed *at least 51 times* after Tesla secrets therein ceased to be relevant to his employment. Dkt. 44-4. And in any event, Li placing his name in the file title, *see* Opp. 11:23–24, does not overcome a valid works for hire provision. *See Dolman v. Agree*, 157 F.3d 708, 712 (9th Cir. 1998) (overcoming works for hire provision requires showing of "mutual intent of the parties").

Li was simultaneously searching for funding for Proception on his Tesla laptop (Dkt. 44-4, Tab L). He does not dispute this. Instead, he half-heartedly argues that the searches did not take that much time. Opp. at 11 n.6.

But again, the forensic evidence shows a clear—and basically unrebutted—*pattern* of (1) accessing confidential Optimus hand-related files, within hours of (2) planning a competing company, and (3) accessing a "snipping tool" in his final days at Tesla that could capture images and file content.[4] The list below contains only a handful of examples of the widespread improper access in the record (Dkt. 44-4):

- On July 15, 2024, Li accessed the "███████████████████████" file, Dkt. 44-4 at Tab B, which contains sensitive sensor and flex testing data and hand model iterations, Dkt. 17-4 ¶ 5(b). Within hours, Li conducted Google searches for, "does incubator provide funding," "does YC fund companies," and "playground vc seed fund." Dkt. 44-4 at Tab L.

- Between July 16, 2024 and his last day at Tesla, September 13, 2024, Li accessed a 353-slide presentation, "█████████████████████████████████████," containing information on

---

[4] The snipping tool allows users to take a snapshot or video to copy words or images from all or part of their PC screen and save and share those images. McDermott Decl. ¶ 25.

tactile sensing in *dexterous robot hands*, motion and tension sketches and diagrams, material specifications, and feasibility studies, Dkt. 17-4 ¶ 5(e), at *least 51* times, Dkt. 44-4 at Tab K.

- On July 18, 2024 Li accessed the "█████" file, Dkt. 44-4 at Tab C—an internal spreadsheet on the Optimus SharePoint with material, strength, and sensor design data and calculations, Dkt. 17-4 ¶ 5(c). That same day, Li ran Google searches for "contractile funding." Dkt. 44-4 at Tab L. The next week, on July 25, 2024, Li executed Google searches for "nvidia funding for robotics startup." *Id.*

- On Jul 29, 2024, Li accessed the "█████" file, Dkt. 44-4 at Tab D, which contained renderings of Tesla's Optimus Gen 3.1 finger and data on cycle testing, Dkt. 17-4 ¶ 5(d). That same day, Li reviewed Google searches for "lux capital fund zie," and "ebots inc funding." Dkt. 44-4 at Tab L. The next day, on July 30, 2024, Li reviewed Google searches for "psyonic hand funding." *Id.* The next week, on August 6, 2024, Li reviewed Google searches for "did stanford get funding from california state." *Id.*

- On August 24, 2024, Li accessed *sixteen* close-range videos, photos, and renderings of the Optimus hand. Dkt. 44-4 at Tab F[5]; Dkt. 17-4 ¶ 4(e).

- On September 3, 2024, Li accessed the "█████" file, which contains proprietary research and analysis, benchmarks, performance targets, equations, and sketches for a flexible sensor design for the Optimus hand. Dkt. 44-4 at Tab G; Dkt. 17-4 ¶ 5(f). On September 12, 2024, Li's second-to-last day, he accessed the "█████" and "█████" files, which are close-range recordings of grip and tension tests conducted on robotic fingers. Dkt. 44-4 at Tab H; Dkt. 17-4 ¶ 5(g).

- On September 13, 2024, Li's last day, he accessed a "snipping tool" and files with "resume" in the names. Dkt. 39-5 (Dkt. 14-39, as originally filed on 6/16/25); *see* Dkt. 14-33, ¶ 13 & Ex. F. This

---

[5] The files are "█████" "█████" "█████" "█████" and "Media (4).jfif" through "Media (11).jfif".

was one of several times he accessed the snipping tool in his last week at Tesla. *See* Ahearn Decl. Ex. C. For example, on September 12 at 11:28 AM, Li accessed the snipping tool, *id.*, and only three minutes later, accessed a "███████████████" PowerPoint, Dkt. 44-4 at Tab H, which contains sensitive information regarding Optimus hand sensors, Dkt. 17-4 ¶ 5(g).

- The log of Li's user activity on his last day at Tesla also contains entries stating "Discovered 47,835 items (26.2 GB)" and "Discovered 19,016 items (26.0 GB)." Dkt. 39-5. These entries indicate that large directory listings or scans occurred during this period. McDermott Decl. ¶ 26; *see also*, *Shippers, a Division of Illinois Tool Works, Inc. v. Fontenot*, 2013 WL 12092056, *5 (S.D. Cal. Sept. 23, 2013) (searches for confidential information in employer database prior to departure is evidence of improper acquisition). The last-day logs also show that Li accessed the "Downloads" folder multiple times on September 13. Dkt. 39-5; McDermott Decl. ¶ 27.

Here, the facts are unrebutted and the conclusion inescapable: Li misappropriated the confidential information in these files for use in the Proception hand, which was launched mere months later.

### 2. Li has no valid explanation for his improper access.

Defendants offer two generic (and unsupportable) excuses for Li's improper access[6] to the many highly sensitive files, including those contained in Liang Ex. A. First, Defendants claim that Li continued to be responsible for "foot sensor-related projects." Opp. at 18. Yet, Defendants do not explain which of the files supposedly relate to the Optimus foot, and each of the files discussed above in § III.A.1, contains critical confidential information specific to the Optimus *hand*. Dkt. 17-4 ¶ 5. Li does not, and cannot, explain why he would need to access, *e.g.*, hand testing data and feasibility studies to assist work on the foot sensors. *See* Pinto Decl. ¶¶ 6–7 (documents in Liang Ex. A were beyond the scope of Li's employment at the time of his access).

Next, Defendants claim that Li continued to access hand-related files due to "his collaboration with colleagues working on the hand project." Opp. at 20. Li claims that he was "a primary source of knowledge" on "hand development as well as the location of information relating to the hand." Dkt.

---

[6] Analysis by Tesla's forensic expert confirms what Tesla has said all along—the entries in Liang Ex. A reflect Li's user-initiated access to the files therein. McDermott Decl. ¶¶ 7–15.

70-3 ¶ 16. Li's claims are belied both by the timing (right before he left) and unjustifiable quantity of his access (hundreds of instances) and by his own admission that he was moved *off* the hand team due to "disagreements . . . about the direction of the hand's" technology. *Id.* ¶ 14.

Li's collaboration narrative is also contradicted by his own conduct regarding the documents. For example, Li accessed "███████████████████████████████" and now claims that "a colleague sent it to him *over Teams*, and upon viewing the document, a copy downloaded to his iCloud drive which later synced to his MacBook." Opp. at 23:1-4. In fact, Li *asked* a Tesla employee, ███████, to send him the document on June 7, 2024. Ahearn Decl. Ex. A. Then, more than a month later, on July 13 (after he had been removed from the hand team), in violation of Tesla's Mobile Device Policy[7], Li logged into Tesla's SharePoint using a web browser on a mobile device and downloaded the document, as well as the other vendor spec document (collectively, the "█████"). Dkt. 14-33 ¶ 6. Li downloaded the █████ to another mobile device again on September 13, his last day at Tesla. Dkt. 14-33 ¶ 6. These facts strongly suggest Li accessed the █████ on July 13 and September 13, 2024, months after *he* asked for them, not to collaborate, but to glean sensitive information about the Optimus hand's parameters. *See* Dkt. 17-4 (Pinto Decl.) ("A competitor could use these documents to copy the hand model or gain a head start on modeling a competitive robotic hand using the same or similar parameters outlined in these documents."). Simply put, Li's self-serving statements regarding "collaboration" cannot be credited.

Defendants also misstate Tesla's policies. While Defendants say, "Tesla identifies no policy that would have precluded Li from accessing, looking at, or even downloading documents relating to . . . the hands while he was at Tesla," Opp. at 20:22-24, this is simply untrue. Tesla's Business Code of Ethics states, "[e]ven within Tesla, all Tesla Business Information should only be shared on a 'need to know' basis,'" and that, "Tesla's intellectual property rights (including . . . trade secrets) are among its most valuable assets." Dkt. 14-22 at 8. Further, Li's NDA also states, "I will hold in strictest

---

[7] Defendants claim that Tesla has not submitted evidence Li agreed to the Mobile Device Policy. Opp. at 23 n.10. But Tesla requires *all* employees agree to the Policy as a condition of employment, Dkt. 14-33 ¶ 10, and Defendants concede failure to comply may result in termination, Opp. at 23 n.10.

confidence Proprietary Information. . . . I will not disclose, use, or publish any Proprietary Information, except as such disclosure, use, or publication may be required in connection with my work for the Company. . . ." Dkt. 1-7 at 2. Once Li was transferred off the Optimus hand project, his repeated access to hand-related files ceased to be "required in connection with [his] work for the Company." *See id.*

### 3. Li's document production proves his improper access.

Li's document production confirms that Li accessed the files he produced after his transfer to the chest computer team. *See* Dkt. 71-19 (Woodland Decl. Ex. 1) (cataloging Li's access to his produced files). Defendants do not dispute Li's access, but instead claim the files Li retained are irrelevant.

With respect to the ▮▮▮▮, Defendants claim Tesla failed to "explain the relevance of the ▮▮▮▮ to Optimus." Opp. at 21:10. Not so. While Tesla has never disputed that these documents were vendor-created, the Pinto Declaration explained that a competitor could use them "to copy the hand model or gain a head start on modeling a competitive robotic hand using the same or similar parameters outlined in these documents." Dkt. 17-4 at ¶ 5(a).

As to the remaining files in Li's production, which Defendants claim are "automatic system-created Cache Files,"[8] Defendants argue that because Li supposedly did not intend to retain these documents, their existence does not support misappropriation. Opp. at 24. But again, these documents confirm Li's access to the underlying files. McDermott Decl. ¶¶ 22–23. And beyond citing Tesla's collaborative environment, Defendants do not specifically address why, after his reassignment, Li accessed the underlying documents in the first place.

### B. The Proception hand's implausible development demonstrates Defendants' misappropriation of Tesla's trade secrets.

---

[8] Tesla already explained that it did not modify the files Li produced and simply loaded them into its Relativity workspace, resulting in legible images. *See* Dkt. 64-14 ¶¶ 4–6. Defendants' expert offers no alternative explanation for how Tesla processed Li's production, nor does he claim Tesla modified the files in any way—which it did not. *See generally*, Dkt. 72-43.

In its Opening Brief, Tesla explains how the "implausibly fast development" of the Proception hand, in just five months, by a handful of employees working with limited resources, demonstrates Proception misappropriated Tesla's confidential information. Op. Br. at 18 (citing *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 849 (N.D. Cal. 2019)). After Defendants vigorously resisted *any* discovery into the Proception hand development, Dkt. 39-2 at 19–20, the Court denied Tesla that expedited discovery without prejudice, Dkt. 54 at 4. Defendants now proffer self-serving statements regarding their supposed reliance on open-source materials, Opp. at 28:21-22, to present a lopsided and unsupportable development story through Li's carefully-crafted and misleading declaration.[9] But their cherry-picked details do not render their story plausible. Defendants list only six people who supposedly assisted with the Proception hand development, two of whom are former Tesla employees. Dkt. 71-3 ¶ 46.[10] Moreover, despite introducing ten exhibits purporting to contain open-source information regarding robotic hands, Li claims the Proception hand "referred to" a *single* open-source project, called DexHand. Dkt. 71-3 at ¶¶ 51–52.

Defendants try to distinguish the Proception hand from the Optimus hand by arguing that the Proception hand is "merely a prototype," which "used off the shelf motors, controllers, and actuators." Opp. at 28–29. Defendants also note that Proception has produced only a robotic hand, whereas Tesla is producing an entire humanoid robot. *Id.* at 28. This illogical argument ignores that the hand is a central part of the Optimus robot. Even further, Proception has publicly announced that its "robotic hands are just the beginning. In the next few years, we'll expand from hands to fully autonomous humanoid robots capable of performing a wide range of tasks across industries." Dkt. 14-25, at 3.

Defendants point to differences in degrees of freedom of the Tesla versus Proception wrist and hand as supposed evidence that no misappropriation occurred, Opp. at 26–27, but there is no requirement that the Proception hand be identical to the Optimus hand for the Court to find misappropriation. *UniRAM Tech., Inc.*, 617 F. Supp. 2d at 945 (operative question for misappropriation

---

[9] Defendants' belated introduction of this one-sided evidence demonstrates the continuing need for a forensic examination in this case.

[10] To seemingly inflate the size of the Proception team, Li also identified an intern who worked on a white paper. Dkt. (Li Dec.) ¶ 46(f).

is whether the infringing product is "substantially derived" from the original). *Speech Tech. Assocs. v. Adaptive Commc'n Sys.*, 1994 WL 449032, at *10 (N.D. Cal. Aug. 16, 1994) is instructive. There, the court rejected defendants' argument that the infringing products were "technologically different" from the original, because the "redesigned" products "were substantially derived from" the original— "[a]lthough some of the technology used in the new products was different, many of the technical aspects, and most of the functional aspects of [the original] were incorporated into the revised" products. *Id.* at *10; *see SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012) (As to "misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived.").

Finally, Li's self-serving—and uncorroborated—statements about Proception's product should be evaluated in the context of (1) Li's failure to deny use of Tesla's trade secrets in his declaration; (2) his evasive conduct in deposition—in which he feigned inability to read plainly legible text (Dkt. 65-4 at 8); and (3) other conflicting statements he has made. For example, in his declaration, Li claims that "[o]ur design for the hand utilizes glove-controlled teleoperation." Dkt. 71-3 ¶ 48. But in March 2025, Proception described its supposed "unique approach to data collection—where we collect data through human interaction *rather than teleoperating robots*." Dkt. 14-25 at 2 (emphasis added). Today, Li tells the Court that "[t]here is no AI involved in the Proception prototype hand." Dkt. 71-3 ¶ 48. But in March 2025, Proception told the market that its "unique approach to data collection … enables us to train more effective AI models for manipulation and task execution." Dkt. 14-25 at 2.

### C. Tesla is likely to succeed on its interference claim.

Defendants assert that Tesla's interference claim is preempted. This is incorrect. Tesla alleged that it has a valid assignment of inventions clause that entitles it to all "right, title and interest in and to any and all *Inventions* that (i) are developed using equipment, supplies, facilities, trade secrets, *or* Proprietary Information of the Company." Dkt. 1 ¶¶ 23, 32 (emphases added). Tesla alleged that Li planned his competing company and product on Tesla's time using Tesla's computer. *Id.* ¶ 34. On its face, interference with that right is broader than use of trade secrets.

### IV. Tesla has suffered and will continue to suffer irreparable harm absent an injunction.

12

Defendants do not seriously contest that if Tesla's trade secrets were misused or disclosed, it would suffer irreparable harm. Instead, they argue, first, that Tesla will not be able to show misappropriation and therefore the Court need not address harm, or at minimum, the harm is only speculative. Second, they argue Tesla supposedly delayed seeking relief.

As to the first, once a competitor possesses trade secrets, misuse may be "virtually untraceable" and impossible to unwind after the fact, such that no later injunction or damages award can restore the status quo. *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *10–11 (N.D. Cal. May 15, 2017). Any misuse by Li of Tesla's confidential information in his work for Proception, a company developing a competing robotic hand, could be impossible to detect or unwind after the fact, further underscoring the need for immediate injunctive relief. Defendants' own cited authority explains that "[o]nce a trade secret is no longer secret, *its value is lost*," and broader disclosure—especially to a competitor—renders the injury irreparable. *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *26 (N.D. Cal. Aug. 24, 2021) (emphasis added); *Greentech, Inc. v. JHL Biotech*, Inc., 2019 WL 1045911, at *19 (N.D. Cal. Mar. 5, 2019); *AT&T Commc'ns of Cal. v. Pacific Bell*, 1996 WL 940836, at *10 (N.D. Cal. July 3, 1996) (loss of control over disclosure of trade secrets constitutes irreparable harm). As Tesla explained, that danger is acute here, and Tesla faces the risk of imminent disclosure of its trade secrets because Proception has announced plans to ship the product to customers by December of this year. *See* Dkt. 14-25 at 4; Dkt. 14-19 ¶ 8. Moreover, Defendants concede they are continuing to refine the Proception hand before shipping the product this fall. Opp. at 28. This fact, in conjunction with Defendants' steadfast refusal to commit to not using Tesla's trade secrets, constitutes an ongoing threat that Defendants may further disclose Tesla's misappropriated trade secrets. *See Power Integrations, Inc. v. De Lara*, 2020 WL 1467406, at *19 (S.D. Cal. Mar. 26, 2020) ("Threatened misappropriation may occur" when a defendant that "actually has misused or disclosed" the plaintiff's "trade secrets in the past," "intends to improperly use or disclose some of those trade secrets," and "wrongly refuses to return the trade secrets."); *see also*, *7EDU Impact Acad. Inc.*, 760 F. Supp. at 997 (Court could

"reasonably infer that [plaintiff's] trade secrets were at threat of disclosure or use" by defendant who downloaded them "days before her departure" and subsequently founded rival company).

Further, Defendants' delay argument ignores both the length and context of Tesla's response. Tesla did not wait years before seeking relief, like the plaintiffs in Defendants' cited cases. *Cf. Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1375; 1377 (9th Cir. 1985); *Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1216–17 (9th Cir. 1984); *Norsat Intern., Inc. v. B.I.P. Corp.*, 2013 WL 5530771, at *9 (S.D. Cal. Oct. 3, 2013). Tesla acted within months, during which time it *repeatedly* attempted to communicate with Li, while investigating Li's conduct. *See Fujikura Ltd. v. Yang*, 2024 WL 3261214, at *6 (N.D. Cal. July 2, 2024) (rejecting similar argument because plaintiff "did not sit idly by" but instead sent "multiple warnings" regarding alleged use of trade secrets); *see also SolarPark*, 2023 WL 4983159, at *8. The harm remains ongoing and imminent; absent an injunction, it cannot be undone.

Tesla also faces irreparable harm from the loss of competitive advantage. "[A] defendant's ability to gain a competitive advantage through the use of confidential information to develop a competing product is sufficient to constitute irreparable harm." *Carl Zeiss*, 2021 WL 1186335, at *10. In *Waymo v. Uber*, the court found irreparable harm where misappropriation threatened to give a competitor a head start in the nascent self-driving car industry, concluding that the resulting loss of market position and opportunity to be first could not be undone with damages. 2017 WL 2123560, at *10–11. The Optimus hand is not yet commercialized, but it is a critical—and the most difficult—component of the humanoid robot. By shortcutting Tesla's years of investment, Proception threatens to deprive Tesla of its first-to-market advantage—a harm courts have deemed irreparable. *See Fujikura*, 2024 WL 3261214, at *1 (irreparable harm where misappropriation denied plaintiff "first to market" advantage with novel tech).

V. **The balance of the equities and public interest weigh in favor of injunctive relief.**

The balance of equities here tips sharply in Tesla's favor. Tesla faces the imminent loss of valuable trade secrets through Proception's expected shipment of products to research customers—or the broader market—before this Court has adjudicated the merits. That harm cannot be undone. By

14

contrast, Defendants claim that an injunction would prevent them from entering the market. But those assertions are conclusory and miss the mark. Any hardship Defendants identify arises entirely from their decision to build a product relying on someone else's technology; stopping any exploitation of misappropriated trade secrets is not an inequitable burden.

Nor does Defendants' sole case support their argument. In *Wisk Aero*, the balance of equities was unhelpful because the plaintiff failed to show likelihood of success. 2021 WL 8820180, at *27. That is not the case here. Moreover, plaintiff's harm in *Wisk* was framed as simply having to "wait" for a misappropriation determination. Tesla's harm is far more pressing: Proception has already stated it will ship its product to customers by December, if it has not already begun doing so. Dkt. 14-19 ¶ 8. Allowing Proception to move forward under those circumstances would cause Tesla irreparable harm.

Additionally, "[t]he public interest is served by the protection of trade secrets and the enforcement of contractual commitments made by an employee to his or her employer." *Carl Zeiss*, 2021 WL 1186335, at *12. While California law strongly favors competition, "this interest yields to California's interest in protecting a company's trade secrets." *Id.* (quoting *Bank of Am., N.A. v. Lee*, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008)). The acquisition and use of trade secrets to accelerate development of a competing product is not "legitimate competition" at all. *See Waymo*, 2017 WL 2123560, at *12.

### VI. No bond should be necessary to enjoin unlawful conduct.

Tesla requests that the Court impose the requested preliminary injunction without a bond. Defendants waived any objection by failing to respond to Tesla's request, *Carl Zeiss*, 2021 WL 1186335, at *12, and no hardship arises from enjoining conduct they had no right to engage in, *Comet Techs. United States of Am., Inc. v. Beuerman*, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018). If, however, the Court determines that some form of security is appropriate, Tesla respectfully submits that a corporate undertaking would adequately protect Defendants' interests. Ahearn Decl. ¶ 6.

### CONCLUSION

Tesla respectfully requests the Court grant Tesla's motion for a preliminary injunction.

| | |
|---|---|
| 1  DATED: September 30, 2025 | Respectfully submitted, |
| 2 | GIBSON, DUNN & CRUTCHER LLP |

By:  /s/Josh Krevitt

Josh Krevitt, Bar No. 208552
JKrevitt@gibsondunn.com
310 University Avenue
Palo Alto, CA  94301-1744
Telephone: 650.849.5300

Angelique Kaounis, Bar No. 209833
AKaounis@gibsondunn.com
2000 Avenue of the Stars, Suite 1200N
Los Angeles, CA  90067-4700
Telephone: 310.552.8500

Orin Snyder (admitted *pro hac vice*)
OSnyder@gibsondunn.com

Jeremy Bunting (admitted *pro hac vice*)
JBunting@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000

*Attorneys for Plaintiff*
TESLA, INC.