UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESLA, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>PROCEPTION, INC., et al.,<br><br>    Defendants. | Case No. 25-cv-04963-SVK<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 14 |

On June 11, 2025, Plaintiff Tesla, Inc. ("Tesla") filed this action against Zhongji "Jay" Li ("Li") and Proception, Inc. ("Proception") alleging that Defendants misappropriated certain trade secrets relating to Tesla's development of its autonomous humanoid robot internally referred to as "Optimus." Dkt. 1. Shortly thereafter, Tesla filed a Motion for Preliminary Injunction (the "Motion") and a Motion for Expedited Discovery in support thereof. Dkts. 14-15, respectively. On June 26, 2025, the Court suspended briefing of the Motion for Preliminary injunction pending its consideration of whether to grant expedited discovery, (Dkt. 37), and on July 8, 2025, the Court granted in part Tesla's Motion for Expedited Discovery, (Dkt. 54). Expedited discovery closed on August 8, 2025, (*see* Dkt. 54 at 5), after which the Parties submitted a stipulated briefing schedule. *See* Dkts. 62-63. This matter came on for hearing on October 22, 2025. Having considered the Parties' submissions[1] and oral arguments, the record in this matter and the relevant law, for the reasons that follow, the Court **DENIES** the Motion.

---

[1] The Parties also submitted various motions to seal confidential information in the briefing. *See* Dkts. 15, 44, 65, 70, 71, 90, 91. The merits of the Parties' sealing disputes are addressed in the accompanying Sealing Order, but the Court notes that throughout the papers and at oral argument (which was open to the public) the Parties requested sealing primarily of narrow, specific information such as file names, file paths, employee names (of employees who have not submitted declarations in this case), team structure information and third-party vendor details. *See id.* On select occasions, Tesla also sought to seal certain Optimus project details. The Court omits any recitation of these matters in this Order in the interest of public access.

## I. BACKGROUND

The Court has before it the Complaint as well as the declarations and exhibits submitted by the Parties in support of (or in opposition to) the Motion. *See* Dkt. 1 ("Complaint"); Dkts. 14–14-39, 17-4, 18 and 44-4 (the Motion and declarations and exhibits submitted therewith); Dkts. 64–64-15 (Tesla's supplemental brief and declarations and exhibits submitted therewith); Dkts. 72 – 72–72-43 (Defendants' opposition and declarations and exhibits submitted therewith); Dkts. 89–89-11 (Tesla's reply and declarations and exhibits submitted therewith). "Because the Court may consider all of these documents, it outlines the facts as explained in them." *E.g.*, *Atlas Ins. Agency Inc. v. Ulmann*, No. 24-cv-00391-JAO (KJM), 2024 WL 5344432, at *1 (D. Haw. Nov. 25, 2024) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (a district court's reliance on "the many exhibits, affidavits, declarations and factual allegations which have been submitted" by the parties was not an abuse of discretion; a "trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.")).

### A.  Defendants' Objections to Reply Evidence Submitted by Tesla

Defendants' objections and administrative motion were heard on October 22, 2025 prior to considering the Motion, and the Court issued its ruling from the bench. Now, before outlining the facts as presently understood, the Court summarizes for the record its decision on Defendants' objections to evidence submitted by Tesla on reply and accompanying administrative motion for leave to file their sur-reply. *See* Dkts. 92-93. In sum, Defendants object to four items raised in Tesla's reply: (1) Tesla's late-proffered declaration from its expert, Sean McDermott; (2) Ex. A to the declaration of Terry Ahearn submitted on reply, showing a Teams communication between Mr. Li and another Tesla employee; (3) Ex. C to the same declaration, adding a collection of entries to Tesla's "Splunk" data log relating to alleged use of the Windows "snipping tool" by Li; and (4) Tesla's assertion on reply of what Defendants contend is a new breach of contract theory.

After hearing arguments, the Court found that items 2 and 3 constituted new evidence but were appropriately responsive to Defendants' opposition. Thus, Defendants' objections as to items 2-3 are **OVERRULED**, and the administrative motion is **GRANTED IN PART**, allowing sur-reply as to these items. The Court will consider the appropriate sections of the proposed sur-

reply in deciding the Motion. As to item 1, the Court found that the McDermott declaration was new and not appropriately responsive: It consisted of evidence and testimony that Tesla should have anticipated the need for and submitted in its original motion or supplemental brief. Accordingly, Defendants' objection as to item 1 is **SUSTAINED**, the expert declaration of Sean McDermott is **STRICKEN**, and Defendants' administrative motion for sur-reply as to the declaration is **DENIED AS MOOT**. Finally, as to item 4, the Court explained that it did not read Tesla's Motion or reply as advancing a breach of contract theory, and no claim for breach of contract is present in the Complaint. The Court accordingly **OVERRULED** Defendants' objection, **without prejudice** to an objection or opposition raised later in the case (if appropriate) if Tesla moves to amend to allege such a theory.

### B. Factual Background

The Court now sets forth the relevant facts.

#### 1. Tesla's Optimus Program and Mr. Li's Work

Tesla, commonly known as a maker of electric vehicles, is generally in the business of "robotics, artificial intelligence, and innovation—developing technologies that push the boundaries of what machines can do and how they can improve human life." Compl., ¶ 1. At the center of this case "is Optimus, Tesla's autonomous humanoid[,] … general purpose, bi-pedal robot capable of performing everyday tasks." *Id.* There are many moving parts to developing an autonomous humanoid robot such as Optimus. At Tesla there are different "Mechanical Design teams that contribute to Optimus, including the foot and hand sensor teams" and the "chest computer team." *See* Dkt. 14-32 ("First Pinto Decl."), ¶¶ 5(a)-(i); Dkt. 64-6 ("Supp. Pinto Decl."), ¶ 1; *see also* Dkt. 72-1 ("Li Decl."), ¶¶ 12-17. The Parties dispute the rigidity of these divisions. *Compare, e.g.*, Li Decl., ¶¶ 10, 18-29 (*e.g.*, "In my experience, a person's team … did not necessarily define the different projects or products … a person was working on. [A] senior manager of the electronic sensor team told me there were 'no hard boundaries' between the teams and departments, and that I should fill in gaps when I see any.") *with* Dkt. 14-22 at 8 ("Even within Tesla, all Tesla Business Information should only be shared on a 'need to know' basis") *and* First Pinto Decl., ¶ 5 (testifying that various files were "outside the scope of Mr. Li's work on

3

the chest computer team.").

Three parts of the robot in particular are relevant to this Motion: the robotic hand, foot and chest. Mr. Li's work on the Optimus project began as part of the "mechanical sensor team" within the "mechanical group" at Tesla. Li Decl., ¶¶ 9, 11. One of his first areas of work involved "working on force and torque sensors for the foot, and eventually expanded to working on tactile sensors for the foot." *Id.*, ¶ 12. At some point thereafter, he also began working on hand sensors. *Id.* However, "following disagreements with members of the electrical engineering sensor team about the direction of the hand's tactile sensor development," (*id.*, ¶ 14), "Mr. Li was transitioned from the [] hand sensors team to the chest computer team on July 1, 2024," (First Pinto Decl., ¶ 5).[2] Mr. Li ultimately gave notice and departed Tesla on September 13, 2024. Proception was formed by Mr. Li six days later, on September 19, 2024. Dkt. 14-14. Mr. Li announced Proception's prototype robotic hand in a post on X, formerly known as Twitter, on March 2, 2025. *See* Dkt. 72-39. Tesla filed this suit on June 11, 2025. Dkt. 1.

### 2. Allegations and Evidence of Access to Trade Secrets

Tesla alleges that Mr. Li and Proception misappropriated "Optimus-related trade secrets," namely those related to Tesla's Optimus robotic hand. *See* Compl., ¶¶ 2, 4 ("At the heart of this misappropriation is one of the most technically complex and strategically vital aspects of Tesla's Optimus program: the humanoid robotic hand."). Tesla alleges that "[t]he trade secrets at issue include highly sensitive (1) engineering specifications, schematics, and blueprints, including measurements, grips, tensions, ranges of motion, and degrees of freedom; (2) tests, their results, and technical analyses; (3) models; (4) product roadmaps; (5) close-range video profiles of prototypes; (6) strategy documents; (7) vendor research; and (8) source code related to Optimus's hand motion and actuators."). The Court refers to the alleged trade secrets at issue as the "Optimus-hand trade secrets." *See id.*, ¶ 4. In support of its Motion, Tesla has put numerous exhibits and various testimony into the record as to alleged misappropriation. The Court

---

[2] Mr. Pinto testified that Li was "transitioned from the *foot and* hand sensors team…." First Pinto Decl., ¶ 5. Li, however, testified that he only "relinquish[ed] [his] role as it pertained to leading hand-related sensor work," and that he "continued to have ownership of, and continued working on, projects relating to foot force and torque sensors, and foot tactile sensors." Li Decl., ¶¶ 14-15.

4

summarizes the key evidence in the Parties' submissions and oral argument.

First, Tesla provides an excerpt of Mr. Li's "Office 365 Access Log and Google Search History" supported by the declaration of Jeff Liang, a Staff Investigator on Tesla's Security Intelligence team. Dkt. 44-4 (the "Access Log"); *see, generally*, Dkt. 14-33 ("Liang Decl."). The Access Log reflects hundreds of instances, from July 2024 to Mr. Li's last day (September 13, 2024), when Mr. Li accessed documents on Tesla's internal SharePoint site. It shows whether files were previewed, accessed or downloaded. *Id.* Defendants' expert Lucas Woodland adds some caveats,[3] but Defendants do not fundamentally dispute that these access events occurred. Dkt. 72-41 ("Woodland Decl."), ¶¶ 32-33.

Rather, the Parties' declarants provide differing explanations for these access events. For Tesla, Prem Pinto, who "led the humanoid mechanical design team under []the director in charge of the Optimus project," (Li Decl., ¶ 11), testified that the files in the log contain various Optimus-hand trade secrets and "were outside the scope of Mr. Li's work on the chest computer team," (First Pinto Decl., ¶¶ 5(a)-(i)). Tesla also adds that the Access Log shows that, simultaneously with some of these access events, Mr. Li conducted Google searches related to funding a potential technology start-up company. *See* Dkt. 44-4 at 29-32. Li, however, attests that "Tesla has a very open and collaborative culture that encouraged the sharing of information relating to the company's development regardless of a given project a person was working on" and explained that his "access to these documents [was] consistent with Tesla's culture of collaboration." Li Decl., ¶¶ 18, 22-23, 26-27. He explained that he "continued to collaborate with the individuals who were working on the hand project [to] share [his] … experience, expertise, and institutional knowledge as one of the first people working on the hands-related sensors." *Id.* Mr. Li further testified that he "freely shared information with [his co-workers on the hand project], including by accessing and sending hands-related documents from Tesla's SharePoint … up to the time [he] departed Tesla." *Id.*, ¶ 27.

---

[3] In particular: (1) that event records such as "FilePreviewed and FileAccessed" are "intended to align with preview vs. access intention" of a user, but are not "a guarantee of the user's intent" and (2) that the Access Log is "limited to Tesla's Microsoft Environment and do not offer insight into the operations on Mr. Li's devices." Woodland Decl., ¶¶ 32-33.

5

Relatedly, on reply, Tesla submitted a Splunk[4] data log showing that, in his last few days, Mr. Li also accessed the Windows "snipping tool" several times. Dkt. 89-6. The Court takes judicial notice of the fact that the snipping tool allows a user to copy a snapshot or video from all or part of his or her PC screen and save the resulting image or video if desired.

Second, during expedited discovery, Defendants produced 21 files related to the Optimus-hand trade secrets that were found on Mr. Li's devices. Woodland Decl., ¶ 21; *see also* Dkt. 72-42 (metadata for the 21 files). These documents fall into the following categories:

- 1 full PDF document found on Mr. Li's iCloud Drive Downloads folder on Mr. Li's MacBook laptop; and
- 20 other files found on Mr. Li's Motorola phone, which were:
  - 1 PDF cache file (*i.e.*, a PDF file stored in a device's cache) with 2 image files embedded therein;
  - 3 files with the ".1" file extension, which are Outlook cache files; and
  - 14 files with the ".cnt" file extension, which are Teams cache files.

Woodland Decl., ¶¶ 14, 18-19, 22-24. A cache file is a file of "temporary data stored in folders … by apps and the operating system to help improve performance and efficiency. [They] can include things like images, thumbnails[], scripts, and files from websites or apps a user used, as well as app-specific data such as search history or user preferences." Woodland Decl., ¶ 6.

As with the Access Log, the Parties do not dispute the presence of these documents. Rather, they dispute the importance of these files (in particular, the cache files) and any inferences the Court should draw therefrom. For example, Mr. Woodland explains that the latter 17 cache files—*i.e.*, everything except for the full PDF, the PDF cache file, and the 2 embedded images—are thumbnails, which are small images that Teams and similar apps use "to give users a quick visual cue of the content without requiring them to open the file or otherwise interact with it in any way." Woodland Decl., ¶¶ 17-24, 28-30. Generally, Mr. Woodland downplays the importance of the files produced. *See, generally*, Woodland Decl. By contrast, Mr. Pinto emphasizes for

---

[4] "Splunk storage logs are documents that record events that occur while a computer system or application is running." Liang Decl., ¶ 13.

example that the full PDF document comes from a third-party vendor (the "Vendor") and "contains detailed sensor specifications related to Optimus's hand motion and actuators" and that one of the cache files, although a thumbnail image, is "a detailed diagram of sensor components containing measurements, materials, and dimensions related to the Optimus arm" prepared for Tesla as part of a customization process with the same Vendor. Supp. Pinto Decl., ¶¶ 5(a)-(b).

### 3. Allegations and Evidence of Disclosure and Use of Trade Secrets

While the above evidence relates to Mr. Li's access to the Optimus-hand trade secrets, Tesla also alleges that, "through Li," Proception "improperly acquired and then further misappropriated," *i.e.*, used, the trade secrets. *See* Compl., ¶¶ 36-39, 41. These allegations are based on "Proception's Implausibly Rapid and Uncannily Similar Humanoid Robotic Hand." *See id.* The following circumstantial evidence is relevant to evaluating these allegations of use and fast development.

Proception was formed on September 19, 2024, six days after Mr. Li's departure from Tesla. Dkt. 14-14. It "made its first hire in October 2024" and, including Li, "7 people worked on developing the Proception hand." Li Decl., ¶ 46. By early March, 2025, Defendants had developed their first functional hand prototype – *i.e.*, after about five months. *Id.*, ¶ 44; *see also* Dkt. 14-25. For comparison, it took Tesla two years from September 2022 to October 2024 to go from the first-generation robotic hand to third-generation robotic hand for Optimus. *See* Dkt. 72-13 ("Venkatesan Decl."), ¶¶ 26-28. As Mr. Li testified, however, Proception was "only focused on designing and developing a hand" and used "3D printed parts and off-the-shelf components," while "Tesla's Optimus robot hand [] has been developed as part of the full Optimus robot" project." Li Decl., ¶¶ 43, 48. Tesla's Optimus hand also involves at least some customized components from third parties, such as from the Vendor. *See* Supp. Pinto Decl., ¶ 5(b).

////
////
////
////
////

7

## II. LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking preliminary injunctive relief must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Id.* at 20. However, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

## III. DISCUSSION

As an initial matter, Tesla "does not need to show a likelihood of success on *every* claim in order to obtain a preliminary injunction." *Museum of Handcar Tech. LLC v. Transportation Agency for Monterey Cnty.*, 778 F. Supp. 3d 1065, 1079 (N.D. Cal. 2025) (emphasis in original), *vacated in part on other grounds,* No. 24-CV-08598-EKL, 2025 WL 1810265 (N.D. Cal. June 30, 2025). Accordingly, Tesla has not sought a preliminary injunction based on "its fourth cause of action (for quasi-contract/restitution)" and raised only its claims for (1) federal misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. §§ 1836, *et seq.*), (2) state misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA") (Cal. Civ. Code §§ 3426, *et seq.*) and (3) tortious interference with contract. *See* Dkt. 14 at 18, 27; Compl. at 13, 15, 17.

The Parties treat the DTSA and CUTSA inquiries as coextensive. *See* Dkt. 14 at 11-12; Dkt. 72 at 24. This includes Defendants' argument that "Tesla's Motion should be denied because it has failed to serve a Section 2019.210 designation of trade secrets and identify its trade secrets with reasonable particularity." Dkt. 72 at 20-24 (referencing cases requiring a statement pursuant to Cal. Code Civ. Proc. § 2019.210 under both the DTSA and CUTSA). Indeed, "[b]oth laws require a plaintiff to show that it possessed a trade secret, that the defendant misappropriated the

8

trade secret, and that the defendant's conduct damaged the plaintiff." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019). However, "[t]o commence discovery and to obtain a preliminary injunction, a plaintiff must first identify its alleged trade secrets," (*id.*), but this requirement is **no longer** coextensive. Rather, after Tesla filed its Motion but before briefing concluded, the Ninth Circuit decided *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, holding that the "DTSA requires a plaintiff to identify a trade secret with 'sufficient particularity' as a matter of fact, unlike CUTSA's 'reasonable particularity' rule" and "unlike CUTSA, [the] DTSA does not set out requirements for the specific timing or scope for identifying trade secrets." 149 F.4th 1081, 1088-89 (9th Cir. 2025). The DTSA thus does not require a disclosure compliant with Section 2019.210, while CUTSA may have such a requirement. *Id.* at 1088 n. 1.

Accordingly, in light of *Quintara*, while Tesla may need to serve a 2019.210 statement in order to identify its trade secrets with "reasonably particularity" and so be entitled to a preliminary injunction as to its CUTSA claim, the Section 2019.210 analysis "does not control a federal trade-secret claim." *Id.* at 1089. In other words, the DTSA claim contains one fewer procedural hurdle than CUTSA. Therefore, the Court addresses only Tesla's DTSA claim (Count I) and Tortious Interference claim (Count III).

### A.    Likelihood of Success on the Merits of Federal Trade Secret Misappropriation

To show that it is likely to prevail on its DTSA claim, Tesla must "[1] show that it possessed a trade secret, [2] that the defendant misappropriated the trade secret, and [3] that the defendant's conduct damaged the plaintiff." *WeRide*, 379 F. Supp. 3d at 845. "To commence discovery and to obtain a preliminary injunction, a plaintiff must first identify its alleged trade secrets with '[sufficient] particularity.'" *Id.* (modifying "reasonable" to "sufficient" pursuant to *Quintara*, 149 F.4th at 1088-89).

////
////
////
////
////

### 1. Tesla Identifies Trade Secrets with Sufficient Particularity

"To show that information is a trade secret, a plaintiff 'may not simply rely upon "catchall" phrases or identify categories of trade secrets.'" *Quintara*, 149 F.4th at 1087 (citations omitted). Rather, he or she "must prove that the claimed trade secret has '*sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.'" *Id.* (emphasis in original). "Whether a trade secret is identified with 'sufficient particularity' is a question of fact." *Id.* "Plaintiffs must 'clearly refer to tangible trade secret material.'" *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998)).

Here, Defendants argue that Tesla has failed to identify its trade secrets with the particularity required. *See* Dkt. 72 at 20-24. However, Defendants' arguments are principally focused on the requirements of Section 2019.210 which, as *Quintara* explained, are inapplicable to the DTSA. *Quintara*, 149 F.4th at 1088-89. As to the simpler question of whether Tesla has identified the alleged trade secrets with sufficient particularity at this stage, the Court finds that it has. In its moving papers, Tesla identified an Access Log with hundreds of files that were related to the development of the Optimus robotic hand, and alleged that these files contained their trade secrets. *See* Dkt. 44-4 (Access Log). Tesla has also explained that these documents fall into "eight detailed categories containing highly sensitive Optimus project" information, namely: "(1) engineering specifications, schematics, and blueprints, including measurements, grips, tensions, ranges of motion, and degrees of freedom; (2) tests, their results, and technical analyses; (3) models; (4) product roadmaps; (5) close-range video profiles of prototypes; (6) strategy documents; (7) vendor research; and (8) source code related to Optimus's hand motion and actuators." Dkt. 89 at 8 (citing Compl., ¶ 4). This is sufficient under the DTSA. *See Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023) ("[S]uch categories of information become sufficiently particularized for purposes of stating a [trade secret] claim where the complaint alleges that these categories of information are contained within specific documents.").

Accordingly, the Court finds that Tesla has identified the Optimus-hand trade secrets with

sufficient particularity for the purposes of moving for a preliminary injunction.

### 2. Tesla's Confidential Information Qualifies as a Trade Secret

Next, Tesla's declarant Mr. Pinto testified that "[t]hese files contain confidential information related to the development of Tesla's Gen4 hand—the component of the humanoid robot considered by the robotics industry to be the most challenging to develop." Pinto Decl., ¶ 5. Mr. Pinto explained that the "Optimus team keeps this information in the strictest of confidence as it is the product of years of research and development." *Id.* He also testified that the information "is not generally known to the greater industry" and that, if "competitors were to gain access to this information, they would gain a significant advantage in the development of a robotic hand (as well as other robotic parts implicating actuators) and in turn, the humanoid robotics market." *Id.* Defendants have not challenged any of these elements (*i.e.*, value and secrecy) of the Optimus-hand trade secrets at this juncture. *See* Dkt. 72 at 20-24. The Court agrees with Tesla and finds that it will likely succeed in showing that the Optimus-hand information and documents at issue are in fact trade secrets.

### 3. Likelihood of Showing that Defendants Misappropriated the Optimus-hand Trade Secrets

The term "misappropriation" means "(A) acquisition of a trade secret … by improper means; or (B) disclosure or use of [the] trade secret…" 18 U.S.C. § 1839(5). The Court addresses Tesla's arguments as to each kind of misappropriation in turn.

#### a. Tesla's Evidence of Improper Acquisition by Li

Tesla's allegations of improper acquisition rest upon the argument that, after July 1, 2024, when Mr. Li was reassigned from the "hands" team to the "chest" team, he "had no legitimate Tesla-related reason to access or download information related to Optimus hands—*i.e.*, the trade secrets at issue." Dkt. 14 at 23-25; *see also* Dkt. 64 at 4-8. As evidence supporting such improper acquisition, Tesla points to (1) the Access Log and Splunk data log and (2) the 21 files found on Mr. Li's devices during expedited discovery. *See, supra*, § I.B.2. For the reasons that follow, the Court is not persuaded that this evidence demonstrates Tesla is likely to succeed in showing improper acquisition by Li. However, it raises serious questions going to the merits.

11

First, the sheer quantity of the "*hundreds* of inappropriate access events," (*see* Dkt. 90-5 at 9 (citing Dkt. 44-4, the Access Log)), is noteworthy. The fact that Mr. Li repeatedly accessed certain sensor-related documents, including highly technical documents such as "source code, specifications, feasibility studies, and test results," (Dkt. 14 at 9), after being reassigned to the chest team may be misappropriation—but only assuming that such access was improper. *See* 18 U.S.C. § 1839(5). "Improper" means, in relevant part, through "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6). Tesla will likely prevail in showing that Mr. Li was under such a duty. *See, e.g.*, Dkt. 14-21 (copy of Tesla's nondisclosure agreement signed by Li). However, Tesla's only evidence at this juncture that Mr. Li's access was in breach of such the duty is the testimony of Mr. Pinto that the documents at issue "were outside the scope of Mr. Li's work on the chest computer team." First Pinto Decl., ¶¶ 5(a)-(i). In opposition, Mr. Li has provided two plausible and reasonable explanations for the access events: first, that he had deep knowledge of the hand-sensor technology and was fielding questions from colleagues who were working on the Optimus hand (in accordance with Tesla's "open and collaborative culture"), and second, that he continued to work on the Optimus *foot* sensor, for which some of the technology overlapped. *See* Li Decl., ¶¶ 18, 22-23, 26-27 (collaboration); *Id.*, ¶¶ 34-35 (ongoing work).

In rejoinder, Tesla leaves unrebutted three critical facts. First, Tesla proffers no evidence, one way or the other, as to whether Mr. Li continued to work on foot-sensor projects. *See* Li Decl., ¶¶ 14-15. At this juncture, the Court credits Mr. Li's testimony as to what projects he continued to work on. Second, Mr. Pinto—despite submitting a declaration in reply—does not refute Mr. Li's general allegations as to the collaborative work environment at Tesla. *See, generally*, Dkt. 89-11. Rather, in reply, Mr. Pinto merely testifies to four documents accessed by Mr. Li that relate to the development of the fourth-generation Optimus hand and which, according to Mr. Pinto, do not relate to foot sensor work. Dkt. 89-11, ¶¶ 6-7. Yet this runs headlong into the third critical deficiency in Tesla's proof: As to the specific instances of collaboration with members of the hand team identified by Mr. Li, Tesla has not provided declarations from **any** of these individuals rebutting Mr. Li's testimony that that he continued to respond to questions regarding hand technology. Mr. Li's explanation of collaboration thus still serves to disarm these

12

documents. *See* Li Decl., ¶¶ 18, 22-23, 26-27. In light of Mr. Li's testimony, the initially concerning access events are cast in a more innocuous light. Tesla's responses to Mr. Li's explanations, in sum, do not support a determination that Tesla is likely to succeed on the merits.

Second, Tesla identified 21 documents that Mr. Li "retained" on his devices after his employment with Tesla. *See, supra*, § I.B.2. These are:

- 1 full PDF document found on Li's iCloud Drive Downloads folder on Li's MacBook laptop; and
- 20 other files found on Li's Motorola phone, which were:
  - 1 PDF cache file with 2 image files embedded therein;
  - 3 files with the ".1" file extension, which are Outlook cache files; and
  - 14 files with the ".cnt" file extension, which are Teams cache files.

*See id.* The "image" and "thumbnail" cache files are not sufficient to show a likelihood of misappropriation given Defendants' expert's unrebutted testimony that such cache files "can be created when a document is sent or received in a chat, when a link is unfurled to show a preview, or when the app preloads content for faster access." Woodland Decl., ¶ 31. In other words, Mr. Li may simply have seen these documents in the Teams or Outlook apps, and there is no evidence that Mr. Li ever downloaded the documents that generated these cache files. *See id.* This is, accordingly, merely additional evidence of access – which is insufficient as explained above.

As for the PDF cache file, although more concerning, its title indicates that it is a foot-sensor, not hand-sensor, related document. *Id.*, ¶ 19. It thus would have fallen within Li's job responsibilities according to his declaration. Li Decl., ¶¶ 14-15, 34. While its continuing presence on his phone raises some concerns, it remains unrebutted that this PDF was also a cache file—not the main file itself—and, accordingly, plausible and innocuous explanations for its presence remain. *See, e.g.*, Woodland Decl., ¶ 21 ("The typical reasons files are saved in a fileCache folder include the following: When one opens a file (like a PDF, image, or video) from a Teams chat or channel, the app may download, without the user knowing, the file temporarily to a cache folder so it can be viewed or played without re-downloading.").

All that remains is the Vendor document found on Li's MacBook iCloud account. *See*

13

Supp. Pinto Decl., ¶¶ 5(a)-(b); Woodland Decl., ¶¶ 13-17. The Parties disagree as to the import of this document. Defendants contend that there is no evidence it even contains the Optimus-hand trade secrets because it is a third-party document. *See* Dkt. 72 at 28. Tesla pointed out at the hearing that, according to Mr. Pinto, it was related to a customized prototype and thus, although generated by the Vendor, contained Tesla's confidential information. October 22, 2025 Hearing Transcript ("Hrg. Tr.") at 82:1-83:6.; Supp. Pinto Decl., ¶¶ 5(a)-(b). In reply, Tesla also argued that the provenance of this document was suspicious: Mr. Li affirmatively asked for it from a colleague, in tension with his story of collaboration, and viewed it not only in July but also again on September 13 (his last day). Dkt. 89 at 13. But in the approved portion of Defendants sur-reply (responding to the late introduction of this Teams chat), Defendants note that Li's colleague's Teams message *undermines*, rather than supports, the assertion that this document contains Tesla trade secrets, and that instead it related "simply [to] upcoming [Vendor] products." *See* Dkt. 92-1. Weighing the evidence, the Court finds that here, there are at best are serious questions going to whether this document contained Tesla's confidential information and whether Li's downloading of the document was improper.

In sum, Tesla has not shown that it is likely to prevail on the merits. However, there are serious questions going to the merits of Tesla's claim that Mr. Li improperly acquired Tesla's trade secrets based upon (a) the sheer quantity and detail of documents Mr. Li accessed between July 1 and September 13, 2024; (b) Li's concurrent Google searches demonstrating that, at the time he was viewing these documents, he had already begun thinking about funding for his start-up venture; and (c) the presence of the third-party Vendor document on Li's laptop.

### b. Tesla's Evidence of Improper Disclosure by Li, Acquisition by Proception and use by Mr. Li and/or Proception

Unlike Tesla's evidence of improper access by Li, its evidence of (1) improper disclosure by Li, (2) improper acquisition by Proception and (3) improper use by them both is entirely circumstantial. To be sure, "[t]he law permits the trier of fact to find trade secret misappropriation based on circumstantial evidence as part of the totality of the circumstances." *Metricolor, LLC v. L'Oreal USA, Inc.*, No. 18-cv-00364-CAS (EX), 2022 WL 17072006, at *10 (C.D. Cal. Nov. 16,

14

2022). For example, "where a plaintiff has shown (1) a likelihood of success at trial of demonstrating possession of trade secrets, and (2) that defendant's product bears a substantial identity with such secrets, the burden shifts to the defendants to prove that they independently developed those trade secrets" *Id.* (internal quotation marks omitted) (citing *Integral Sys., Inc. v. Peoplesoft, Inc.*, No. 90-cv-02598-DLJ, 1991 WL 498874, at *13 (N.D. Cal. July 19, 1991)). Here, however, the circumstantial evidence presented by Tesla is too attenuated to support a likelihood of success as to any of these three avenues of misappropriation.

As to Li's "possession of trade secrets," the only document about which serious questions remain in the Court's view is the third-party Vendor document. *See, supra*, § III.A.3.a. Beyond that, Li's "possession of trade secrets" is only supported by the many access events and an inference that Mr. Li was memorizing, retaining or surreptitiously recording the confidential information he gained from working on the Optimus hand team. As to both of these categories, as explained above, the Court has some doubts that Tesla is likely to show that misappropriation has occurred. *See id.* Even setting that concern aside, however, Mr. Li testified that he never disclosed any such information to "anyone outside of [his] work at Tesla." Li Decl., ¶¶ 38-42.[5]

To counter Li's testimony, Tesla urges that the "implausibly fast" timeline of development of Proception's hand along with the similarity of the Proception hand to the Optimus hand supports an inference of disclosure by Li, acquisition by Proception and use by them both. *See* Dkt. 14 at 25-26. As to the timeline of development, Defendants point out that while Tesla designed a hand as part of a fulsome humanoid robot using customized, bespoke parts, Defendants

---

[5] In arguing that "Proception knew or should have known that it was using Tesla's Optimus trade secrets," Tesla points out that "Li co-founded Proception" and, being "Proception's CEO—knew or should have known that the files he accessed and downloaded" contained trade secrets. Dkt. 14 at 25. To the extent this is an argument that the Court should infer disclosure from the mere fact that Li is Proception's founder and chief executive officer and as such would have inevitably shared such information, this argument fails. "[T]he inevitable disclosure doctrine is not the law of the State of California or the Ninth Circuit." *Computer Scis. Corp. v. Computer Assocs. Int'l, Inc.*, No. 98-cv-01374-WMB (SHX), 1999 WL 675446, at *16 (C.D. Cal. Aug. 12, 1999); *see also UCAR Tech. (USA) Inc. v. Yan Li*, No. 17-cv-01704-EJD, 2017 WL 6405620, at *3 (N.D. Cal. Dec. 15, 2017), *on reconsideration on other grounds,* No. 17-cv-01704-EJD, 2018 WL 2555429 (N.D. Cal. June 4, 2018) ("California courts have resoundingly rejected claims based on the 'inevitable disclosure' theory." (citing *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (2002) ("Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete.")).

15

developed only a prototype hand only and used many off-the-shelf components to speed development. *Compare* Venkatesan Decl., ¶¶ 26-28 *and* Supp. Pinto Decl., ¶ 5(b) *with* Li Decl., ¶¶ 43, 48. As to the similarity of the hands, without the benefit of expert testimony from both sides, the Court declines to decide whether the two hands are significantly different or overlapping. Weighing both the timeline and lack of similarity evidence, the Court finds that Tesla has shown serious questions, but not a likelihood of success, as to whether the Defendants disclosed (Li), acquired (Proception) or used (both) the Optimus-hand trade secrets.

* * *

In sum, the Court finds as to all of Tesla's theories of misappropriation that there is insufficient evidence to support a likelihood of success on the merits. However, Tesla has shown serious questions going to the merits of its misappropriation claims. This may support a preliminary injunction only if "if the balance of hardships tips sharply in the plaintiff's favor[] and the other two *Winter* factors are satisfied." *Friends of the Wild Swan*, 767 F.3d at 942.

### 4. Likelihood of Success of Showing Damages

Finally, to succeed on the merits, Tesla must also show that the alleged misappropriation damaged it in some way. Neither Party addresses damages separately in their analysis. Following the analysis of other courts in this District, "[d]amages are discussed in the section on irreparable harm." *WeRide Corp.*, 379 F. Supp. 3d at 846 n.3.

### B. Likelihood of Success on the Merits of Tortious Interference with Contract

As to Tesla's separate claim for tortious interference with contract, Tesla has similarly shown at best serious questions going to the merits.

> The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)).

Here, Defendants argue that "Tesla's tortious interference claim is preempted by the

CUTSA." Dkt. 72 at 37. The Court need not decide at this juncture, however, whether Tesla's claim is preempted. It is enough to note that Tesla argues the relevant contract is Li's nondisclosure agreement, (Dkt. 14 at 27), and accordingly the fourth element (the alleged "breach or disruption of the contractual relationship") rests upon Li's alleged disclosure of the Optimus-hand trade secrets to Proception. Because the Court has found that, at best, Tesla has raised serious questions going to the merits of whether such disclosure occurred, (*see, supra*, § III.A.3.b.), it follows that Tesla has, at best, raised serious questions as to whether Mr. Li breached his nondisclosure agreement and thus whether Proception induced such a breach. Thus, Tesla has failed to show a likelihood of success on the merits of its tortious interference claim.

### C. Likelihood of Irreparable Harm

Tesla argues that it will suffer irreparable harm if an injunction does not issue for two reasons: first, because of the potential that Defendants, possessing Tesla's trade secrets, will disclose them either intentionally or unintentionally and, second because of the loss of competitive advantage from allowing Defendants to ship their product to market. Dkt. 14 at 28-30; Dkt. 89 at 17-18. The Court agrees with Tesla in part.

First, the potential for disclosure of trade secrets is generally an irreparable harm. "A trade secret once lost is, of course, lost forever." *WeRide Corp.*, 379 F. Supp. 3d 834 at 853. However, even in the context of trade secrets, the Court must examine not whether harm may accrue in the abstract but whether Tesla has shown that the specific trade secrets at issue are likely to be disclosed. *E.g.*, *Lilith Games (Shanghai) Co. v. UCool, Inc.*, No. 15-cv-01267-SC, 2015 WL 5591612, at *10 (N.D. Cal. Sept. 23, 2015) ("Alleged harm that is remote or speculative will not be considered irreparable; rather, the movant must demonstrate that the threatened harm is imminent.") (declining to find irreparable harm despite finding that plaintiff was "likely to succeed on its trade secret misappropriation claim."). Here, the only concrete Optimus-hand trade secrets that Tesla has shown might be disclosed (assuming it ultimately prevails on the misappropriation claim) are those contained in the third-party Vendor document or generally known as information in Li's mind. *See, supra*, § III.A.3. Tesla has not shown any likelihood that *these specific* trade secrets, however, have been used by Proception in developing its hand or that there is any

likelihood that they will be further disclosed or destroyed. Tesla thus has not shown a likelihood of irreparable harm from their disclosure.

Second, as to the possibility of loss of competitive standing, however, the Court agrees with Tesla. Here, *Waymo LLC v. Uber Techs., Inc.* is instructive. No. 17-cv-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017). While loss of competitive standing may not always be irreparable, in the case of a nascent industry—such as "the nascent self-driving car industry" in *Waymo* or autonomous humanoid robots in this case—it "would likely be futile to attempt, after the fact, to estimate the monetary value of injury suffered from [] the loss of [Tesla's] competitive position in this nascent industry." *Id.* at *11. Thus, while the Court does not doubt that Tesla would suffer some damages due to its loss of competitive standing (thereby satisfying the final element of likelihood of success on its trade secret misappropriation claim), damages alone would not be sufficient to remedy the harm to Tesla.

Accordingly, assuming Tesla ultimately prevails on its claims of misappropriation, the Court concludes Tesla has shown that irreparable harm would follow.

### D.     Balance of the Equities

The Court has concluded that even though Tesla has shown a likelihood of irreparable harm due to the likely loss of competitive standing if Proception ships its competing robotic hand, it has not shown a likelihood of success on the merits. *See, supra*, §§ III.A-C. Under the *Winter* test, the analysis could stop here. *See Winter*, 555 U.S. at 20. However, under the Ninth Circuit's alternative *Cottrell* test, because Tesla has shown "that there are serious questions going to the merits" and a likelihood of irreparable harm, "a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor" and if an injunction is in the public interest. *Friends of the Wild Swan*, 767 F.3d at 942 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.2011)). The Court thus considers the balance of the equities in this case.

Tesla has repeatedly characterized the relief it is seeking as "exceedingly proportionate and narrow." *E.g.*, 89 at 6; Hrg. Tr. at 19:24-20:2. The Court disagrees. Tesla does not merely ask Mr. Li to refrain from disclosing (to Proception or others) the Optimus-hand trade secrets he may

18

know. Nor does Tesla merely ask that Mr. Li and Proception refrain from using such trade secrets in their products. Rather, Tesla seeks an "order halting Defendants from shipping *any* robotics product or disseminating *any* technology or confidential information about any robotics product to third parties without prior order of this Court permitting such shipment or dissemination." Dkt. 14 at 2 (emphasis added); *see also* Dkt. 89 at 6 ("Tesla also asks that they not ship their [allegedly] infringing product absent an order of the Court."). This broad request would stop Proception—a robotics start-up in the nascent humanoid robotics industry (*see* Li Decl., ¶¶ 43, 46)—from shipping "any robotics product" or even from conducting further research with any third-party (whether under non-disclosure agreements or otherwise) because they could not "disseminat[e] any technology or confidential information about any robotics product to third parties." Dkt. 14 at 2; Li Decl., ¶ 54. In effect, Tesla asks this Court to order Defendants to go dark until further order of this Court – presumably after merits-discovery and expert discovery has concluded and only if Tesla satisfies itself that no trade secrets are implicated by Defendants' products. *See* Li Decl., ¶¶ 54-55 (such an injunction "will effectively halt Proception's hand development.").

So, on one end of the scale, if the injunction does not issue, Tesla stands to lose some competitive standing to a small start-up competitor. *See, supra*, § III.C. Such harm is irreparable, but it is not insurmountable: Tesla would still be a large and sophisticated player in the market and, moreover, would only lose ground on the "hand" portion of its robot, (*see* Li Decl., ¶¶ 43-44). On the other end of the scale, Proception would be forced to completely halt development of its hand, be forced to halt its fundraising and fall behind in the market. Li Decl., ¶¶ 55-58. The Court need not decide if the balance of hardships ultimately tips in Tesla's favor or Proception's favor, but it cannot find on this record that the balance tips "sharply" in Tesla's favor.

### E. Public Interest

Because the Court finds that the balance of hardships does not tip sharply in Tesla's favor, and the Court previously found that Tesla raised only serious questions going to the merits, it need not examine the fourth *Winter* prong (whether an injunction is in the public interest).

////

////

## IV. CONCLUSION

In sum, the Court finds that Tesla has not satisfied either the *Winter* or *Cottrell* tests for a preliminary injunction. Tesla cannot show a likelihood of success on the merits of its misappropriation claim under the DTSA pursuant to *Winter*. Moreover, although the Court does find there are serious questions going to the merits of the claim, because the balance of hardships does not tip sharply in Tesla's favor, the injunction Tesla seeks is also not warranted under *Cottrell*. For these reasons, Tesla's motion for preliminary injunction is **DENIED**.

**SO ORDERED.**

Dated: November 14, 2025

_____
SUSAN VAN KEULEN
United States Magistrate Judge